**Ara DERDIARIAN and John S. Whaley,**
**on behalf of each of them and all other**
**persons similarly situated, Plaintiffs,**

**v.**

**The FUTTERMAN CORPORATION et al.,**
**Defendants.**

**Civ. No. 63–1367.**

United States District Court
S. D. New York.

Jan. 28, 1966.

Herman Odell, New York City, for plaintiffs (Seymour Bucholz, New York City, of counsel).

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Futterman (Jay H. Topkis and Peter M. Panken, New York City, of counsel).

Halpert & Burger, New York City, for defendants Eichler, Schreiber.

Freedman, Levy, Kroll & Simmonds, Washington, D. C., for defendants Grunebaum & the New York Hanseatic Corp.

David H. Shapiro, New York City, for defendant McIntyre.

Baar, Bennett & Fullen, New York City, for defendant Robinson.

Bondy & Schloss, New York City, for defendant Steiner.

Borden & Ball, New York City, for defendant Gasco.

Hughes, Hubbard, Blair & Reed, New York City, for defendants, the Executors of Estate of Robert A. Futterman, deceased.

RYAN, District Judge.

There are before us three applications for fees to be paid by the Futterman Corporation as provided in the Stipulation and Agreement of Compromise and Settlement, dated July 1, 1965, for professional services rendered to the named plaintiffs and all other persons similarly situated. Herman Odell, Esq., requests an allowance of $450,000.00 plus expenses of $2,275.13; Ferro Berdon & Co., accountants, request fees of $50,000.00; and the firm of Knapp & Berson, attorneys for objecting stockholders, seek counsel fees of $75,000.00.

This settlement is unusual in that the fees in suit are to be paid by the defendant, the Futterman Corporation, rather than out of a fund created for distribution to the plaintiff class. The Futterman Corporation does not question the applicants' right to compensation, but it

contends that the fees to be paid should be substantially reduced to a maximum of $44,300 for Mr. Odell, $20,000 for Ferro Berdon & Co., and $5,000 for Knapp & Berson.

This action commenced in May 1963 is based on violations of the federal security laws administered by the Securities and Exchange Commission. After extended arms-length negotiations, a settlement was reached which, with certain modifications, was approved by the Court on September 20, 1965.

The parties basically agree on the factors which are to be considered by the Court in determining the fixation of fees, but they disagree on the value of settlement received by the plaintiff class and the proportion of this benefit which the Court should adopt as proper in the awarding of fees.

The terms of the settlement provide:
1. Futterman will issue up to 2,000,-000 options to all shareholders who purchased Class A stock between July 19, 1960 and April 3, 1962, one option for each such share. No options will be issued to corporate insiders or certain securities dealers who profited from dealing in Futterman stock;

2. Each option will entitle the holder to put one share of Class A stock to Futterman for $6 during the last 10 days of the two years after its issuance;

3. Futterman may call the option at any time prior to its exercise for $1.25;

4. The holder of an option who sold the stock after April 3, 1962 and before July 8, 1965 may put the option to Futterman for 70 cents within thirty days of its issuance;

5. Certain holders of Class B stock will sell a total of 29,695 shares to Futterman at $1 per share, and the Estate of Robert Futterman will surrender for cancellation an additional 40,305 Class B shares without compensation;

6. Special releases will be given to the defendants for any conduct in connection with the public offerings of stock complained of; and a bar order against further similar actions will be entered.

About half of the 2,000,000 options will be issued to former stockholders of Class A stock who sold their stock after April 3, 1962 and before July 8, 1965. The parties agree that the value of these options is about $700,000. Where the parties differ is on the valuation of the approximately 1,000,000 options to be issued to those Class A stockholders who did not sell their stock prior to July 8, 1965. The defendant argues that, because the last day for taking an appeal from this Court's approval of the settlement agreement was November 20, 1965, that should be the date on which the value received by the benefited class should be computed; and furthermore that, since the market price of Futterman stock was $5.625 per share on that date and since the agreement called for a purchase price by the corporation two years hence at only $6.00 per share, the market price of the option would be approximately $.20 per option or a total of $200,000 for the 1,000,000 options.

The attorney for the plaintiff, however, contends that the options should be considered as "puts" (options to sell) and valued as such. A "put" on a relatively speculative stock for above present market price, exercisable two years hence, would have a value in excess of $1.25; but he continues since the defendant can buy the option for $1.25 at any time prior to its exercise and since Futterman Corporation would be likely to exercise its option because redemption of so much stock at $6 per share would be a tremendous strain on the corporation's resources, a value of $1.25 per option should be used in computing the value of the settlement. In addition, Mr. Odell contends, no great weight should be given to the market price of Futterman stock on November 20, 1965 because of the uncertainties of the stock market and the fact that, on July 1, 1965, the date the settlement was signed by the parties, and for a period of time prior to and after that date,

the stock had been selling for approximately $4 per share.

The option in this case cannot be evaluated as if it were a put on a stock at $6 per share, because the value of a put includes the value of the guarantee that, even if the stock is worthless on the put date, the buyer will pay $6 per share for the stock. Futterman Corporation's liability is limited by the agreement to $1.25. However, to consider only the November 20, 1965 market price of the stock, without some consideration of its recent past performance in determining the value of the settlement, would be unfair to the parties involved and would result in an inaccurate reflection of the value of the settlement.

■ Under the terms of the settlement, the rights of those stockholders who sold their shares before July 8, 1965 and those who did not are exactly the same except that the former class has the alternative of putting their options to Futterman Corporation within 30 days of their issuance for $.70 per option. In determining the value of the latter class' options, we cannot ignore the fact that the market price on the effective date of the settlement was close to the option price of $6 and has continued to rise since that time. The parties agree that $.70 per option is a fair value for the options of the former stockholders. The value of the same option without the $.70 provision must be somewhat less. We find that $.50 per option is the fair value, giving due consideration to the present value of the stock, its recent past performance, the uncertainties of the stock market and the length of time before this option can be exercised. We also find that plaintiff's attorney is not entitled to any compensation for the return of the Class B stock since this recovery was not for the benefit of the plaintiff class and was not brought about by him, but was the result of the negotiations of the Futterman Corporation represented by its own counsel. We also find that Mr. Odell is not entitled to be compensated for the administrative expenses which will be borne by Futterman Corporation. Therefore, we find that the fair value of this settlement is approximately $1,200,000.

■ In addition to the value of the settlement, another factor which the Court must consider in fixing attorney's fees is the time spent in bringing about a successful settlement. Mr. Odell states that he spent 729¾ hours of recorded time on this case. His associates spent 97¼ hours of recorded time, about half of this amount was spent by a recent law school graduate. In addition, Mr. Odell claims to have spent an estimated 450 additional hours of unrecorded time on this case and claims that another 50 hours of unrecorded time was spent by an associate attorney of 15 years' experience. The Court of Appeals has indicated the importance of attorneys keeping careful records of the amount of time expended in cases like the one at bar. Attorneys are well aware of this requirement and of the reasons for it; therefore, little weight has been given to the unrecorded time spent by Mr. Odell and his associate. It must be kept in mind, however, that the amount of recovery rather than the time spent is the prime factor in fixing Mr. Odell's fee. The fact that Mr. Odell has been the attorney in very similar cases and, therefore, had to do less work in preparing for this case, an argument raised by defendant should not in any way prejudice his claim for fees. Expertise in a field of law should be rewarded rather than be used as the basis for fee reduction.

■ Other factors, including the difficulty encountered in unearthing the facts, the contingent nature of the fee, and counsel's qualifications, have also been considered in arriving at a fee.

■ It is the policy of this Court not to award fees to accountants, particularly when no order was entered authorizing their employment. While we do not question that they have rendered valuable services, we feel that this is better treated as a disbursement to be made by the plaintiff's attorney. We,

therefore, make no direct allowance to Ferro Berdon & Co. but note that we consider this as a reasonable disbursement. The award to Mr. Odell is ample to cover whatever accounting services were rendered to him in the preparation of this case and its final settlement, and the amount to be received by them should be reached by agreement with Mr. Odell. We, therefore, award to Herman Odell, Esq., fees and all disbursements of $145,-000.00.

Knapp & Berson were attorneys for a group of objecting stockholders. Their contribution was basically as follows:

Under the Settlement Agreement, certain defendants agreed to donate 40,305 shares of Class B stock to Futterman and to sell an additional 29,695 shares at $1 per share. Delivery was to be made "not later than 20 days after all of the options expire or are called or redeemed, whichever first occurs"—but the transaction could be effected at any earlier date which the parties desired.

Under the Futterman Certificate of Incorporation, as amended, Pr. Sixth (2), the Class B stock has the right, until July 1, 1966, to elect two-thirds of the directors, provided that at least 100,000 shares of Class B stock are outstanding. After July 1, 1966, the voting rights of the two classes become identical. When the Settlement Agreement was signed, there were 150,000 shares of Class B stock outstanding. Therefore, prior to the settlement, about 4% of the outstanding shares of the Futterman Corporation controlled the operations of the corporation.

The Futterman Corporation annual meeting of stockholders is held in May. Accordingly, the Class B stock would have the right to elect two-thirds of the directors at the May 1966 meeting if the defendants who were to sell and donate Class B stock to Futterman held their stock until after the meeting.

Under the Settlement Agreement, as we have seen, the timing of the transaction was completely discretionary so long as the options were outstanding. Thus, under the Settlement Agreement, unless the corporation called the options before May, the defendants who were to sell and donate Class B stock could freely decide whether they wanted Class B to elect two-thirds of the board for one last term. These same defendants now own only about 10% of the Class A shares.

Such were the provisions of the Settlement Agreement before the advent of Knapp & Berson. Mr. Knapp filed objections on August 5, 1965 and a carefully prepared supporting memorandum of law on Friday, August 20. On Monday, August 23, at a conference with counsel for Futterman, a resolution of Mr. Knapp's objections was worked out. The objections were all withdrawn in exchange for a commitment from the defendants who were to sell and donate Class B stock that they would do so forthwith upon the Settlement Agreement becoming effective. Thus Knapp & Berson's chief contribution was the early democratization of the Futterman Corporation's voting structure. Mr. Knapp, a member of the bar for 15 years, has stated that he spent 137½ hours of recorded time and a younger associate spent 73 hours in the achievement of this result.

No one disputes the fact that the democratization of a publicly held company is of value to its stockholders. The question is how much benefit has been conferred on the Class A shareholders by advancing the democratization of the corporation from July 1, 1966 to November 20, 1965. Knapp & Berson contend that their efforts contributed to the rise in the market price of the Class A stock and that, therefore, they are entitled to a small percentage of this substantial increase as their fee. It is very difficult to place a value on their contribution to the settlement, nevertheless several results of their efforts are clear: the immediate transfer of control of the corporation allows for the election of the board of directors by the Class A shareholders at the May 1966 annual stockholders' meeting without the necessity of calling a special stockholders'

meeting sometime after July 1, 1966; immediate democratization lessens the possibility of action by the directors during the interim period which might be unfavorable to the corporation.

We, therefore, award to the firm of Knapp & Berson the fee of $7,500.00 for their efforts in connection with the settlement of this case. No disbursements were requested.

So ordered.