Paul **MILSTEIN** and Bessie N. Shapiro, as shareholders of GAF Corporation, in the right of GAF Corporation, Plaintiffs,

v.

Jesse **WERNER** et al., Defendants.

Elaine **MENDELSON**, Plaintiff,

v.

John A. **COLEMAN** et al., Defendants.

Nos. 70 Civ. 2178 (MP), 70 Civ. 5420.

United States District Court,
S. D. New York.

March 6, 1973.

Stroock & Stroock & Lavan, New York City, for plaintiff Milstein by Louis Loss, Cambridge, Mass., David Lubart, Charles G. Moerdler, Stephen A. Block, Robert P. Stein, New York City, of counsel.

Mortimer G. Levine and Mortimer Shapiro, New York City, for plaintiff Shapiro.

Bennett Frankel, New York City, for Deborah Glickman.

Abraham I. Markowitz, New York City, for plaintiff Mendelson.

Simpson Thacher & Bartlett, New York City, for individual defendants by Whitney North Seymour, Sr., Rolon W. Reed, and Charles E. Koob, New York City, of counsel.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendant GAF Corp. by Edwin J. Wesely, and Richard A. Horgan, New York City, of counsel.

Richard A. Ash, Objecting Stockholder, pro se.

Baer & McGoldrick, New York City, for Objector Cletus M. Lyman by John J. McLaughlin, and Cletus P. Lyman, Philadelphia, of counsel.

Abraham Gemunder, Objecting Stockholder, pro se.

OPINION

POLLACK, District Judge.

The plaintiffs in a consolidated shareholders' derivative suit brought on behalf of GAF Corporation have applied for allowance of compensation to their attorneys herein. The underlying suit was terminated by a comprehensive and conscientiously negotiated settlement, submitted to this Court on September 22, 1972 and approved as submitted on December 18, 1972, following adequate notice to all shareholders and a full hearing on objections held November 17, 1972.

The Court also has received a fee application from a non-attorney shareholder who appeared and participated in the questioning at the November 17, 1972 hearing. Another objecting shareholder who was represented by counsel at the November 17 hearing had initially filed for an allowance of compensation to his attorney. This application has since been withdrawn, following a proposed arrangement made with plaintiffs' counsel—which the Court is now asked to approve—by which the allowance to plaintiffs' counsel will be shared with those attorneys who appeared for the objector in question at the hearing on the settlement. The Court ordered a hearing, which was held on March 2, 1973, to ascertain the relevant facts and circumstances of this proposed arrangement.

The allegations of the original complaint (as amended), the progress of discovery, the terms of settlement, and the merits of all objections have been fully considered in this Court's opinion of December 13, 1972. 57 F.R.D. 515 (1972). For present purposes, it is necessary only to analyze the benefits of the litigation and settlement to the corporation and to evaluate with some precision the contributions of the attorneys. See Derdiarian v. Futterman Corp., 254 F.Supp. 617 (S.D.N.Y.1966).

## I. *Application of Plaintiffs*

### A. *Benefits of the Litigation and the Settlement*

The thrust of this derivative suit, brought against officers and directors of GAF, was that inside officials of GAF, particularly the chief executive officer, exerted inordinate control over the operation of the corporation and that, as a result, executive employees were excessively compensated. Plaintiffs contend that as they pressed their suit, GAF responsively pushed for reform. Specifically, plaintiffs note that information given to outside directors was expanded to match the insiders' briefings that certain purportedly unprofitable operations were reduced or closed, that corporate management and accounting procedures were improved, and that the composition of the GAF Board of Directors was changed to insure more independent directors. These salient changes, to plaintiffs, were causally related to the pendency of their suit.

The primary, direct benefit secured by the settlement is an alteration in the Plan for the Sale of Restricted and Unrestricted Stock to Employees Who Perform Executive, Supervisory and Administrative Functions (hereinafter "Stock Purchase Plan"). As originally adopted and instituted, the Stock Purchase Plan had allowed select employees of GAF to purchase shares of the corporation's stock at 20% of the prevailing market price. Additionally, loans from the corporation were provided to cover the purchase price. Pursuant to the terms of the settlement, the Stock Purchase Plan is modified so that the minimum purchase price for stock will be 50% of the last closing price of GAF common stock on the New York Stock Exchange at the time of the purchase.

Plaintiffs contend that this modification will result ultimately in an additional consideration to GAF of at least $3,297,600 and, using GAF's own calculations, in increased gross and after-tax net income of $4,793,393 and $2,492,590, respectively. Such objective projections, to be sure, rest on subjective assumptions, and plaintiffs have provided the string of variables. Most important are the assumptions that 458,000 shares remaining in the Stock Purchase Plan will be sold and that the market price of GAF stock will remain at least at the level of $24 a share prevailing at the time of the settlement. The market price of the stock has since receded and is now about $15½. The plaintiffs derive the figure for the prospective benefit by multiplying the difference in the new discount rate (30%) by the assumed market price ($24.) and by the number of shares to be sold (458,000). Moreover, plaintiffs' assumptions presuppose certain facts about the future course of the national economy and of GAF's performance, about executive changes at GAF, and about the administration of the Stock Purchase Plan.

It is undoubtedly true that the modification of the Stock Purchase Plan will produce some substantial monetary benefit for the corporation. Any shares of stock sold under the Plan, irrespective of the market price, will bring a higher consideration than would have been paid before the change was made in the Plan discount factor. Nevertheless, the precise dollar figure for this benefit is less easily predicted. The sale of the shares remaining under the Plan is to be accomplished over several years, perhaps as many as twelve. It is necessary to assume that plaintiffs' set of suppositions will prevail during that entire period of sale in order to confidently conclude that the projected benefit will actually be realized. Even then, the benefit will be received over time, and some adjustment for present value would seem appropriate. Suffice it to say that the $3.297 million figure is recognized as a projection, rather than as an imminent certainty.

## B. *Contribution of Plaintiffs' Counsel*

This Court has, on several occasions, noted the perseverance that runs through the history of this suit. From the preparation of the pleadings through the signing of the settlement, plaintiffs' counsel prosecuted the suit with skill and vigor and, as the Court found at the November 17, 1972 hearing, achieved "a bonanza result in an excessive compensation case."

An affidavit filed on behalf of plaintiff Milstein chronicles the hours and the effort invested by counsel in order to achieve this successful result. The role of counsel began almost three years ago, when plaintiff Milstein asked his lawyers to evaluate the bringing of a derivative action on behalf of GAF. This evaluation required a study of GAF financial reports, as well as of much published or available material about GAF. Counsel attended the annual shareholders meeting in 1970, in order to glean some first hand impressions on the GAF management performance.

Based upon this evaluation, plaintiff Milstein decided to launch this derivative suit, and counsel prepared and filed a 27-page pleading. Once the action was formally initiated, this Court soon became aware of the pending suit and was able to directly observe much of the pretrial proceedings. These proceedings included extensive discovery, which ultimately produced over 14,500 pages of numbered documents, 1,700 pages of deposition transcripts, and over 65 pages of answers to interrogatories. Each page and each document had to be studied and categorized as counsel prepared for trial.

Moreover, plaintiff had to face and fight a very active and highly skilled defense. Initially, defendants served a set of affirmative answers and counterclaims, which plaintiff subsequently moved to dismiss. That motion required the preparation of a brief and reply brief, running an aggregate of some 60 pages. Further, the discovery process —being quite broad in scope—almost inevitably produced some opposition from the defendants, and documentation and requests had to be prepared and presented for the resolution by this Court of the discovery procedures to be followed. Subsequently, the plaintiff had to resist a motion to terminate all discovery, following the filing of the amended complaint. In addition, late in 1971, defendants moved to dismiss the complaint, claiming plaintiff Milstein did not adequately represent GAF shareholders in general. In successfully opposing this motion, plaintiff Milstein submitted 15 pages of affidavits and a 27 page brief. As discovery progressed, this Court ordered the parties to prepare documented proposed findings of fact and conclusions of law. This documents required a review of all materials produced during discovery, as well as extensive legal research. Plaintiff initially served a 46 page document, which, after a pretrial conference with this Court, resulted in proposed ultimate findings of fact reduced to a 32 page document.

As the case was being readied for trial, two additional procedural matters arose. Plaintiff Shapiro, who had an action pending in New York Supreme Court, moved to intervene in the Milstein suit, and plaintiff Mendelson, who had a parallel federal suit pending in this District, moved to consolidate the two federal actions. These motions were granted on January 14, 1972.

Settlement discussions had been commenced in October 1971. The negotiation process, which lasted nearly a year, required re-evaluation by counsel of all legal theories and documents and involved many long and aggressive negotiating sessions.

The firm of Stroock & Stroock & Lavan, which represented Milstein and became lead counsel in the consolidated action, has detailed the working hours expended by the firm. Three lawyers

worked on the case almost exclusively for one year, and during much of their time for another year. In addition, 29 attorneys and para-professionals participated at various times. Through October 1972, these legal and para-legal personnel spent almost 5,000 hours on the case, at a billing cost (based on standard "Wall Street" charges) of $237,697.[1] These figures do not include the work performed by counsel to the other plaintiffs in the consolidated suit, nor the services rendered as counsel to the Stroock firm by Louis Loss, William Nelson Cromwell, Professor of Law, at Harvard Law School.

But the contribution of plaintiffs' counsel goes beyond this summary sketch of hours, motions, and documents procured. This Court has little difficulty in concluding that the performance of counsel revealed expertise, dedication, and aggressiveness. After pursuing the action for some 2½ years, plaintiffs successfully negotiated and obtained a settlement that clearly will benefit the corporation and its shareholders and, through the prosecution of this suit, at least indirectly stimulated a corporate catharsis that leaves GAF in a stronger management position.

### C. *The Fee Allowance*

#### 1. *Legal Standards*

■ The determination of a fee allowance necessarily begins with a recognition of the character of litigation presently involved. In reorganizations and liquidations under the bankruptcy laws or under the Securities Investors Protection Act, lawyers are required to perform necessary services in preserving and distributing funds; they are drawn into a proceeding which was precipitated by the financial instability of a debtor. Attorneys' fees are therefore structured to attract skilled counsel but at the same time are limited by the desire to preserve funds for the debtor, or its creditors and investors. *See, e. g.*, In Re Mabson Lumber Co., 394 F.2d 23 (2d Cir. 1968); SIPC v. Charisma Securities, Inc., 352 F.Supp. 302, 306–307 (S.D.N.Y.1972).

■■ Derivative suits, on the other hand, require the initiative of shareholders to commence the suit, and the probable level of compensation for attorneys as a practical matter directly affects the ability of shareholders to exercise such initiative. Thus, fee allowances in this area should be viewed as an incentive, as much as a just reward for services performed. *See* Denney v. Phillips & Buttorff Corp., 331 F.2d 249 (6th Cir.), cert. denied, 379 U.S. 831, 85 S.Ct. 61, 13 L.Ed.2d 39 (1964). And the benefit for a corporation often obtained through such a suit requires that the incentive be sufficient, *see* Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 371, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966); Denney v. Phillips & Buttorff Corp., 331 F.2d 249 (6th Cir.), cert. denied, 379 U.S. 831, 85 S.Ct. 61, 13 L.Ed.2d 39 (1964); Steinberg v. Hardy, 93 F.Supp. 873 (D.Conn. 1950), although not so excessive as to foster mere strike suits. *Steinberg, supra.*

In the case of In re Osofsky, 50 F.2d 925, 927 (S.D.N.Y.1931), the Court listed the relevant elements to be considered in determining an attorney's fee. Although that case arose in a bankruptcy context, these elements can well be adapted and applied to the present situation:

(1) The time which has fairly and properly to be used in dealing with the case; because this represents the amount of work necessary. (2) The quality of skill which the situation facing the attorney demanded. (3) The skill employed in meeting that situation. (4) The amount involved; because that determines the risk of the client and the commensurate responsibility of the lawyer. (5) The

---

1. Hours of para-professionals, of course, are not compensable at attorney's rates.

## 550

result of the case, because that determines the real benefit to the client. ■ The eminence of the lawyer at the bar, or in the specialty in which he may be practicing.

*See also* Angoff v. Goldfine, 270 F.2d 185, 189 (1st Cir. 1959); Newmark v. RKO General Inc., 332 F.Supp. 161 (S. D.N.Y.1971); Derdiarian v. Futterman Corp., 254 F.Supp. 617 (S.D.N.Y.1966); ABA, Code of Professional Responsibility, D.R.2–106.

■ Of these factors, most significant is the benefit conferred. Derdiarian v. Futterman Corp., 254 F.Supp. 617, 620 (S.D.N.Y.1966). That the litigation ended by settlement rather than by going through the uncertain results of a trial may be considered in assessing the value of the services though avoidance of uncertainty of achieving benefits does not obviate a generous award in the presence of a favorable settlement. *See* Kahan v. Rosenstiel, 424 F.2d 161, 167 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); Fischman v. Wexler, 309 F.Supp. 976, 979 (D.Del.1970); Globus, Inc. v. Jaroff, 279 F.Supp. 807 (S.D.N.Y.1968). Nor does the fact that the settlement does not create a present or even an actual fund from which payment will be made prevent a substantial fee. If the suit has produced a significant benefit for the corporation, the corporation fairly may be charged with the costs of litigation. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 392, 90 S.Ct. 616, 24 L. Ed.2d 593 (1970).

■ To enable the Court to factor the element of time into the fee equation, the moving party must supply complete and accurate time sheets. In re Borgenicht, 470 F.2d 283 (2d Cir. 1972). Estimates of the parties and impressions of the Court do not provide an adequate substitute.

■ The elements of novelty or difficulty of the matters involved, the skill employed, and the reputation of the lawyers at the bar, while requiring subjective assessments, can be evaluated by a Court which closely supervised and observed the progress of the case. *See* Pergament v. Kaiser-Frazer Corp., 224 F.2d 80, 85 (6th Cir. 1955) (*per curiam*).

### 2. *The award*

■ Plaintiffs have requested an attorney's fee of $524,140 plus disbursements and expenses of $75,860, a total of $600,000. Of this total, the counsel for plaintiffs Mendelson, Glickman, and Shapiro would receive $65,000; the remaining $535,000 would be paid to the Stroock firm. The requested total of $600,000 represents 19.2% of the projected benefit to the corporation of $3.-297 million in additional consideration from the Stock Purchase Plan.

As discussed above, the Court is not willing to value the present benefit from this settlement at $3.297 million. No immediate fund has been created which the corporation can record, as would be the case had those allegedly receiving excessive compensation been required to make partial restitution. Rather, the corporation will only begin to realize a financial benefit as shares are issued for sale and are actually purchased through the Stock Purchase Plan. Plaintiffs admit that only about one-fifth of the available shares likely will be released for purchase in the coming year. The benefit as projected remains a future return, if not fully a speculative return.

GAF's background and the nature of the subject matter furnish a sufficient indicator on which reasonably and reliably to forecast the future accrual to the corporation of the benefits contended for the change in the Stock Purchase Plan. However, in the interests of conservatism and keying, to an important degree, the compensation due to counsel to the actual total realization thereof, payment of compensation will in a mea-

sure have to await the actual issuance of the stock and accrual of the advantages. The full amount payable to plaintiffs' counsel as fees and disbursements reasonably should not exceed $500,000.

However, the Court will not award a present payment of the full allowance to which counsel may become entitled as fixed hereafter. While a generous share of the recovery is reasonably indicated, a payment of the full allowance at the present time would be substantially in excess of the present benefit to GAF.

Rather, in evaluating the elements stated above, the Court finds it fair and appropriate to award the amount of $300,000 as a present instalment against the total allowance of $500,000 in fees and disbursements to be made herein. This advance award may appear quite generous, but is in keeping with the probabilities of the actual benefit to GAF, the time expended and disbursements incurred by counsel, the thoroughness with which they proceeded and the reputation and experience of the counsel supplied herein. Additionally, the advance award recognizes that some tangible, monetary benefit will shortly be realized by GAF, even if the projected total allowable figure is never fully secured and it recognizes also the purging effect of this litigation on the management and financial structure of GAF which merits compensation.

■ It should be emphasized, however, that absent the adjustment to the Stock Purchase Plans, the other benefits claimed by the plaintiffs to have derived from this suit would not have justified the substantial fees which are provided for herein. In order for an attorney's fee to be awarded where a fund has not been created, it is necessary to demonstrate a causal nexus between the suit and the benefit. The changes in GAF management, summarized above, may have been accelerated by this suit, but other causal factors—including the stockholders' fight in which plaintiff Milstein was a principal—had a likely impact.

As and for the full allowance of fees and disbursements the Court will award to plaintiffs a contingent allowance based on amounts actually realized as a result of the adjustment to the Stock Purchase Plan. Specifically, the full fees and disbursements are fixed at 15% of the cash benefit realized pursuant to the settlement, not to exceed $500,000, with payments in addition to the $300,000 to be due when, and only if, the $300,000 awarded herein has been covered by this contingent formula. The calculation of "cash benefit to GAF" is to be 30% (the change in discount factor) multiplied by each share sold and by the prevailing market price per share. Such computation and additional payment, if any, shall be made at the end of each fiscal year in respect to additional consideration realized during that year on any part of the 458,000 shares of common stock issued under the Stock Purchase Plan. As between the several counsel for plaintiffs, the division of the initial and future payments, if any, should follow the proportions reflected by their agreement on sharing the total award. (This does not refer to counsel for the objector who will be treated separately hereafter).

■ This formula is intended to insure that the fees earned are based on a realized benefit, not on an illusory projection. In awarding an initial fee of $300,000 against a contingent total of fees and disbursements of up to $500,000, this Court has considered primarily the nature of the benefit obtained by the settlement and the substantial amount to which a percentage would apply, but has also weighed the complexity of the suit and the actual contributions of counsel. As the amount of a recovery involved increases, equity and good conscience requires that fees

based on percentages of the total recovery should decrease.

## II. *Application of Objectors*

The rule pertinent to applications by objectors for allowance of compensation to counsel or of expenses was stated some time ago by Judge Wyatt in Schleiff v. Chesapeake & Ohio Railway Co., Docket No. 68 Civ. 3478 et al., S.D. N.Y., March 12, 1968, as follows:

The basis for an allowance in such cases is that as a result of the objections the fund has been increased. There is, of course, no such basis for an allowance in the case at bar. In principle, there can be no allowance except where the applicant has helped to create a fund, in which event it is only fair that an allowance be made out of the fund created in whole or in part by the efforts of applicant. When there are objections to a settlement but the settlement is approved as submitted, the making of the objections has been of no benefit to the corporation or its stockholders and no allowance can be made to objectants. (Case citations omitted).

 Settlement hearings do not hold the promise of unearned rewards to invitees. An objector must risk the genuineness of his attack on a settlement. If his effort fails to produce any change or other benefit, he has not contributed any service for which compensation may be allowed. Raiding a settlement with unmeritorious cavil merely obstructs; it does not advance the legitimate interests of the corporation or of its stockholders.

 Allowances of compensation to an objector's attorney will only be granted in exceptional cases. Newman v. Stein, 58 F.R.D. 540, S.D.N.Y., 1973 (Ward, J.). Moreover, compensation is

not due to a would-be champion of the shareholders whose corporate crusade has been terminated by the res judicata effect of an approved settlement and the judgment entered thereon.

 The Court has received an application from a non-attorney shareholder who appeared *pro se* and who voiced his views at the proceedings; he requests reimbursement of the expenses of his attendance. There is no legal basis for reimbursement of the expenses of attendance of a stockholder invited to the hearings on a settlement proposal. Such attendance produced no benefit for the corporation, save perhaps to make the shareholder more aware of the scope of the settlement.

At the hearing on the settlement, counsel appeared on behalf of shareholder Cletus M. Lyman (represented by his son, Cletus P. Lyman, Esq.) and of Richard Ash, Esq. (appearing *pro se*). During the course of the hearing, which lasted nearly four hours, Messrs. Lyman and Ash cross-examined plaintiffs' witnesses, argued a motion to adjourn the hearing, and submitted affidavits raising certain objections to the settlement herein. In so doing, they helped to air some obvious matters involved in the settlement and helped to spread them on the record.[2]

The Court initially received a request from objector Lyman for an attorney's fee of $6,000. Applying the criteria stated above, as a preliminary matter the Court finds Lyman's initial request wholly out of line with the importance and actual usefulness of the appearances and service rendered. The roles of objector Lyman and of counsel Lyman were rather limited. While the appearance at the hearing did provide vocal opposition and did, consequently, focus at-

---

2. The amount of fees and disbursements to plaintiffs' counsel was not influenced in any wise by any services or activity of any objector; it resulted from the Court's application of the standards expressed above.

tention on aspects of matters related to the settlement, that degree of participation in no wise added any new benefit to or change in the settlement. Even absent that appearance, the Court would have been able to fairly and fully review the fairness of the settlement. *See* Newman v. Stein, 58 F.R.D. 540, S.D. N.Y., 1973 (Ward, J.).

 This Court has received a written withdrawal of Lyman's application for compensation. In its place, the Court is advised that plaintiffs' counsel propose to give Lyman and Ash $3,500 out of plaintiffs' allowance; the Court is asked to approve this arrangement.

There is no proper basis on which the plaintiffs' counsel should be required to share their fees with the objectors' attorneys. The appearance, even if not the fact, of impropriety seems to be lurking in this arrangement. It would not be proper for the Court to sanction a fee sharing arrangement which does not accurately reflect the division of responsibility and services assumed by each for which the corporation is to pay. ABA, Code of Professional Responsibility, DR2–107(A)(2); EC2–22. To do otherwise would encourage unethical arrangements and buy-offs indirectly violative of the purposes of Fed.R.Civ.P. 23.1. As Chief Justice Taft pointed out in Weil v. Neary, 278 U.S. 160, 173, 49 S.Ct. 144, 149, 73 L.Ed. 243 (1929), arrangements for division of compensation are contrary to public policy not only because of "actual evil results but their tendency to evil in other cases."

Accordingly, the application to sanction a payment of fees to the attorneys for objecting shareholders is disapproved and the application of the stockholder for reimbursement of expenses is denied.

So ordered.