**In re FIRST FIDELITY BANCORPO-RATION SECURITIES LITIGATION.**

**Civ. No. 88–5297(HLS).**

United States District Court,
D. New Jersey.

Nov. 13, 1990.

Max W. Berger, Bernstein, Litowitz, Berger & Grossman, New York City, Leonard Barrack, Barrack, Rodos & Racine, Philadelphia, Pa., Allyn Z. Lite, Goldstein, Till, Lite & Reiken, Newark, N.J., for plaintiffs.

Marc E. Lesser, Kronsich, Schkeeper & Lesser, P.C., Livingston, N.J., for objector Kathryne Roth.

Lawrence J. Fox, Drinker, Biddle & Reath, Philadelphia, Pa., Alan L. Zegas, West Orange, N.J., for defendants.

## OPINION

SAROKIN, District Judge.

Before the court is the petition by counsel for plaintiffs for an award of fees.

## FACTUAL BACKGROUND

This action stems from the announcement of large loan losses by First Fidelity Bancorporation on December 13, 1988, following its merger with Fidelcor, Inc., a Pennsylvania bank, on February 29, 1988. Plaintiffs, purchasers of stock between the merger date and December 13 (the "class period"), brought this action against First Fidelity Bancorporation and various officers of First Fidelity and Fidelcor.

Plaintiffs alleged violations of federal securities laws, including Sections 10(b), 14(a) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, Rules 10b-5 and 14a-9 promulgated thereunder, and Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, as well as various state law causes of action. They alleged that various statements in press releases, annual reports, 10-K reports and a joint proxy statement put forward by the defendants during the class period were materially misleading in light of undisclosed financial problems at First Fidelity and Fidelcor. Plaintiffs alleged that representations as to the Bank's high projected earnings, stringent credit and loan review procedures, conservative lending policies, diversified portfolio, adequate loan reserves and minimal exposures to risky countries and industrial sectors misrepresented facts and omitted material information concerning the riskiness of the Bank's financial status. More specifically, plaintiffs alleged that after the merger, Fidelcor diverged from the Comptroller of the Currency's definition of "non-performing" and "substandard" loans to hide problems in the acquiree's portfolio; that First Fidelity failed to reveal the substance of two reports by the Comptroller of the Currency criticizing the Bank's lending practices; and that the Bank failed to reveal a partially collateralized, nearly $100 million loan to Historic Landmarks for Living, Inc., that the loan exceeded internal limits on risk, and that Historic Landmarks was under investigation by the I.R.S. for overvaluing its properties and in precarious shape due to changes in tax shelter laws under the 1986 Tax Reform Act.

The court has approved the settlement agreed upon by the parties, which met no objections by class members. According to the provisions of the settlement, defendant First Fidelity has paid, in settlement of all claims asserted by the class, the sum of $30,000,000 plus interest which is accruing for the benefit of the class, for a total of $30,900,000. That portion of the Settlement Fund not required for expenses incurred for notice and administrative costs has been invested in United States government obligations. Attorneys' fees and costs will also be paid from the Settlement Fund. In addition, in settlement of the derivative claims, the individual defendants agreed to pay First Fidelity the sum of $15,000,000.

The only outstanding issue for the court's determination is the award of attorneys' fees. Plaintiffs' counsel petition, jointly, for an $8,000,000 award of attorneys' fees. The sum sought is approximately 26% of the Settlement Fund. Plaintiffs' counsel also request reimbursement of out-of-pocket expenses, including expert expenses, totalling $323,872.34. The one objector to the fee award sought by petitioners suggests a sliding scale fee percentage in view of the relatively large settlement obtained: 33% of the first $1,000,000, 25% of the next $4,000,000, 22.5% of the next $5,000,000, and 20% of amounts in excess of $10,000,000. The total fee proposed is $6,455,000, representing 21.52% of the Fund, not including interest.

## LEGAL DISCUSSION

Counsel have called the court's attention to the report of the Third Circuit Task Force on Court Awarded Attorney Fees of which this court was the chair. *Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237, 255 (October 8, 1985). Counsel have politely and respectfully urged the court to "practice what it preaches" and apply a contingency standard, based on a percentage-of-the-fund method, in the determination of the appropriate fee. Indeed, the sole objector also urges the court to adopt such standard and only objects to the percentages sought by counsel.

The approach for calculating attorneys' fee awards in widest use is the "lodestar" method, obtained by multiplying the number of hours expended by the attorneys' normal hourly rate. *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973), *appeal following remand*, 540 F.2d 102 (3d Cir.1976). The lodestar could then be increased or decreased by some "multiplier," based upon the contingent nature or risk in the particular case involved and the quality of the attorneys' work.

As the Task Force report sets forth in greater detail, the lodestar approach to fee setting in common fund cases has revealed a number of deficiencies. Those which are particularly pertinent to this type of matter are as follows:

1. Requiring the court to calculate the number of hours devoted by counsel and evaluate the services rendered is unrealistically burdensome and time-consuming. Even assuming the court were to undertake such a detailed analysis, the court is unable in most instances to determine whether particular services were necessary. How can a court ascertain in hindsight whether a particular deposition was appropriate? Even if the results of a deposition were unproductive, should counsel be denied compensation if the deposition was conducted in good faith? The time spent by courts conducting such investigations might well exceed the time devoted to the merits of the litigation.

2. Without casting any aspersions upon the profession, awarding compensation based on hours spent is likely to increase the time devoted. If counsel anticipate that their ultimate fee will be measured by the amount of time devoted to the matter, the incentive for efficiency is totally dissipated.

3. As a reciprocal result, a disincentive to early settlement is created. The lodestar approach penalizes rather than rewards counsel for an early resolution and distribution to class members. The less time counsel devote to a matter the less they will receive, subject to the possible multipliers which will be discussed hereafter.

Although these shortcomings will continue to prevail in most statutory fee cases, they can be avoided in common fund cases by return to the contingency fee concept.

The Supreme Court has recognized the validity of using the percentage formula for awarding attorneys' fees in common fund cases. *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984). A number of courts, in this circuit and outside of it, have applied the percentage formula. *See In re TSO Financial Litigation*, No. 87–7903, slip. op., 1989 WL 80316 (E.D.Pa. July 17, 1989), and cases cited in appendix; *Sala v. National Railroad Passenger Corp.*, 128

F.R.D. 210, 214 (E.D.Pa.1989), and cases and commentators cited at 214; H. Newberg, *Attorney Fee Awards* § 2.07 at 8–9 (Supp.1990).

In the instant case, petitioners as well as the sole objector support the use of a percentage method rather than the lodestar formula. Unfortunately, counsel did not avail themselves of the procedure outlined in the Task Force Report, wherein the contingent fee is to be negotiated and approved at the outset of the litigation. *Task Force Report*, 108 F.R.D. at 255–258. The procedure envisioned by the Task Force best replicates what normally occurs between client and counsel when counsel first undertakes a matter on a contingency basis. For counsel to seek a contingent fee after the matter has been resolved is akin to placing a wager after the outcome of the event is known or playing poker with everyone's cards face up. The percentage of recovery should be negotiated and fixed while the risks and amount of recovery are still unknown. Having failed to follow that procedure, the court, nonetheless, remains convinced that the fee awarded in this matter should be based upon some percentage of the recovery giving due deference primarily to the competence of counsel, the complexity of the case, the time devoted, the risks undertaken and the result achieved for the members of the class.

Absent an agreement initially approved by the court, the award by necessity resurrects many of the infirmities which prompted adoption of the lodestar formula. It requires an *ad hoc* determination by the court as to what is a fair and reasonable fee under all of the relevant circumstances. The lack of uniformity and predictability in such case-by-case and judge-by-judge determination is one of the evils the lodestar approach sought to end. Such deficiencies can be avoided or minimized by adoption of a prior negotiated fee procedure, as discussed above.

Having recognized the possible revisiting of these evils, the court determines that in this matter the appropriate percentages of the Fund should be as follows:

| | |
|---|---|
| Thirty percent (30%) of the first $10 million | $3,000,000 |
| Twenty percent (20%) of the next $10 million | $2,000,000 |
| Ten percent (10%) of all monies over $20 million | $1,000,000 |
| | $6,000,000 |
| Plus all out of pocket disbursement and expenses in the amount of | $323,872.34 |
| TOTAL | $6,323,872.34 |

The court does not believe that these percentages should be applied to any appreciation in the Fund through investment. Rather, the fee should be established as of the date the Fund is established, *see In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 588 (3d Cir.1984), and counsel should receive interest on their share of the Fund. Counsel's share in the Fund should increase, by accruing interest, in the same proportion as the Fund increases.

As the Task Force has recommended, a sliding scale is appropriate particularly in view of the large amount here involved. *Task Force Report*, 108 F.R.D. at 256 n. 63. Some courts have used the sliding scale approach, *see, e.g., In re Smithkline Beckman Corp. Securities Litigation*, No. 88–7474, slip op., 1990 WL 167649 (D.C.Pa. Oct. 29, 1990); *In re Savings Investment Service Corp. Loan Commitment Litigation*, No. 87–560, slip op., 1990 WL 61936, LEXIS 7728 (W.D.Okla. Jan. 31, 1990); *Sala*, 128 F.R.D. 210, and other courts have recognized the principle that where the fund is large, a smaller percentage should be applied. *See TSO*, No. 87–7903, slip op. at appendix (only cases with total awards below $12 million, and in most cases $1–5 million, showed fee awards at percentages of 25% or above); *Rothfarb v. Hambrecht*, 649 F.Supp. 183, 185 n. 12 (N.D.Cal.1986) (recognizing same phenomenon); *Milstein v. Werner*, 58 F.R.D. 544, 551–52 (S.D.N.Y.1973) ("As the amount of a recovery involved increases, equity and good conscience requires that fees based

on percentages of the total recovery should decrease.").[1]

The sliding scale approach responds to one of the court's primary concerns, that the fees awarded not be so exorbitant as to diminish the public's confidence in the system. Fee awards are designed to encourage counsel to undertake such matters, fairly and reasonably compensate them, and provide protection to class members whose distribution and losses will be directly affected by the amount of such awards. The danger is that fees may be viewed as a windfall to counsel, rather than as fair compensation for the risk undertaken, the time devoted and the result achieved. Those who criticize the amount of such awards should understand that absent counsel's efforts there would be no fund; and even despite counsel's efforts, in some cases there is no success and thus no fee, no matter how much time and effort was expended. The good result should be rewarded, because the poor result will go uncompensated.

A fee based upon a percentage of the fund reflects market practices and expectations and in the long run is more apt to promote public respect and confidence than where a fee is based upon hours spent and customary charges, multiplied by an arbitrary figure. The public would be appalled at a fee which equals the total fund obtained even if justified by the time devoted, because of a lack of relationship to the result achieved. Likewise, the public should readily accept a fee which is proportional to the benefit derived and conferred, although not directly to the time devoted.

One of the objections enumerated by the Task Force to the use of multipliers by judges in calculating fees based on the lodestar formula is that it permits a result-oriented judge to manipulate the figures so as to arrive at the pre-ordained fee. In determining that a multiplier of approximately 2.5 would be appropriate in this case, in all candor this court must admit that it has done just that. A fair and reasonable fee in this case after consideration of all of the relevant factors is $6,000,-000. To arrive at that figure the court must apply a multiplier of approximately 2.5 to the lodestar.[2] To suggest that the multiplier was chosen without first determining its resultant effect upon the fee would not be candid. But in essence, the court concludes that the fee based upon a declining scale and a multiplier consistent with that approach results in a fee fair to counsel and the class members.

Finally, although this opinion refers to the outstanding competence and performance of counsel for the plaintiffs, it is important to note that the settlement required and received equally competent and dedicated services from counsel for all defendants. The results of the lodestar approach which drive the litigation machine for plaintiffs' counsel likewise provides the same temptation for defense counsel. For them, compensation did and would continue from the defendants *without risk* as long as the litigation continued. It is apparent that in assisting in the fair and reasonable settlement of this matter, they acted in the highest traditions of the bar in bringing the matter to an amicable conclusion in the interests of their own clients and the class members. Although the fees awarded hereunder go to plaintiffs' counsel only, the court's appreciation and admiration extends

---

1. There is considerable merit to reducing the percentage as the size of the fund increases. In many instances the increase is merely a factor of the size of the class and has no direct relationship to the efforts of counsel. On the other hand, there is also considerable merit to Judge Bilby's ruling in *In Re American Continental Corporation/Lincoln Savings and Loan Securities Litigation,* Fee Order, M.D.L. Docket No. 834 (D. Ariz., July 24, 1990), which increased the percentage as the size of the fund increased. Such formula creates a greater incentive to counsel to increase the size of the fund, because their participation will increase accordingly.

However, we must proceed on the assumption that counsel will continue to act in the best interests of the class even though counsel's participation lessens as the fund increases, until experience proves otherwise.

2. Counsel claim to have jointly devoted 11,258.-59 hours to the litigation. Their lodestar figure is $2,422,783.90. In consideration of the contingent nature of the case and the quality of the attorney's work, petitioners request a multiple of approximately 3.3 of their lodestar figure.

to all counsel before the court in this matter.

## CONCLUSION

For the foregoing reasons, petitioners are awarded attorneys' fees and costs in the amount of $6,323,872.34, to be drawn from the Fund, and attorneys for the objector are awarded $5,000.00 for their services.