Gearald CLARK, Tom Burden, Ronald Brandow, Robert Burnside and Wayne Burnside

v.

LOMAS & NETTLETON FINANCIAL CORPORATION, the Lomas & Nettleton Company, Lomas & Nettleton West, Inc., NCS Computing Corp., now known as Booth, Inc., Jess T. Hay, L & N Computer Services, Inc., John Sexton, Albert Rohnstedt, Dewitt T. Ray, Guy W. Rucker, Robert E. Glaze and James B. Gardner, et al.

No. CA3–7465–F.

United States District Court,
N. D. Texas,
Dallas Division.

Aug. 7, 1978.

See also D.C., 79 F.R.D. 658.

Jay S. Fichtner, Douglas E. Yeager, Berman, Fichtner & Mitchell, Dallas, Tex., David Berger, Stanley R. Wolfe, Warren D. Mulloy, Berger & Montague, P. C., Philadelphia, Pa., for plaintiffs.

Stanley E. Neely, Stephen Philbin, Elizabeth Lang, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., Beale Dean, Brown, Herman, Scott, Dean & Miles, Fort Worth, Tex., for LNFC, L&N, LNW, Hay, Rohnstedt, Ray, Sexton, and Gardner defendants.

Tim Kirk, Saner, Jack, Sallinger & Nichols, Dallas, Tex., for Booth, Inc.

John L. Lancaster, III, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for defendants Dan Busbee and Richard Rogers.

Joseph W. Geary, Gerald P. Urbach, Geary, Stahl, Koons, Rohde & Spencer, Dallas, Tex., for defendant Ernst and Ernst.

Robert F. Middleton, David White, Stalcup, Johnson, Meyers & Miller, Dallas, Tex., for defendants Trammell Crow and Robert Glaze.

J. Carlisle DeHay, Jr., Gardere, Porter & DeHay, Dallas, Tex., for defendants Steinberg, Generes, Lueressen & Vogelson.

Stan McMurray, Rain, Harrell, Emery, Young & Doke, Dallas, Tex., for defendants Guy W. Rucker, Jack J. Booth, Martin T. Whitmer, and Fladger F. Tannery.

## ORDER APPROVING SETTLEMENT

ROBERT W. PORTER, Judge.

Scientists, philosophers, theologians and a few ordinary mortals have long speculated about the origin of the universe. Scientists have recently concluded by using sophisticated measuring equipment and employing various theories regarding the relationship between matter and energy that the source of creation (as far back as science can trace) was a tight ball of hydrogen which split apart in all directions in a "big bang", slowly condensing to form stars and planets which are still traveling at great speed from the source of the explosion. The "big bang" wiped out any definitive answers to the question "what created the tight ball of hydrogen?" and scientists must also speculate about what will happen to all of the disbursed bits and particles scattered around the universe by the "big bang", although many scientists believe that the particles will condense in a few billion years and then perhaps explode again.

The history of this case has paralleled the creation of the universe. Unlike the cosmological events, we can date precisely the beginning of this event, but, like the creation of the universe from the condensed mass and as is the case in all litigation, it is impossible to know exactly what transpired before that date (though the lawyers would argue that they have accumulated more evidence on that question in this case than the scientists have discovered about what came before the date of the "big bang" explosion).

The *Clark* case began on July 27, 1973 when the Plaintiffs filed a 12 page securities fraud complaint requesting individual and derivative relief. The Plaintiffs sought recovery, allegedly on behalf of NCS Computing Corporation (hereinafter "NCS") against Defendants Lomas & Nettleton Financial Corporation (hereinafter "LNFC"), its two wholly owned subsidiaries, The Lomas & Nettleton Company (hereinafter "L & N") and Lomas and Nettleton West, Inc. (hereinafter "L & N West"), Hay, Sexton, Ray, and Rohnstedt as a result of their alleged violations of Section 10(b) and Rule 10b–5 and Section 27.01 of the Texas Business and Commerce Code in connection with the sale by NCS to LNFC of 350,000 shares of common stock of NCS in January of 1969 (all of the allegations now summarized are taken from Plaintiffs' Third Amended Complaint).

Plaintiffs also sought recovery against Defendants Gardner, Glaze, Hay, Rucker and Sexton, as well as LNFC as a controlling person, for their role in preparing and soliciting proxies for voting at the annual meeting of shareholders of NCS held on October 8, 1971. In addition Plaintiffs charged that Defendants Gardner, Glaze, Sexton and LNFC (as a controlling person) improperly prepared and solicited proxies for the annual meeting of NCS shareholders held on September 20, 1972.

Count 9 of the Plaintiffs' Third Amended Complaint sought recovery against Defendants LNFC and L & N West based upon said Defendants' alleged breach of a servicing agreement (Ex. A to the Third Amended Complaint). Plaintiffs also sought recovery derivatively against LNFC, L & N, L & N West, Ernst and Ernst, Busbee, Rogers, Sexton, Hay, Glaze, Gardner, Tannery, Jack Booth, Whitmer and Crow for alleged violations of Section 10(b), Rule 10b–5, Section 14, Rule 14a–9, and Section 12 of the Securities Act of 1933.

Plaintiffs finally sought derivative recovery against Defendants LNFC, L & N, L & N West, Hay, Sexton, Ray, Rohnstedt, Glaze, Gardner, Rucker and Ernst and Ernst for breach of fiduciary duties owed to

NCS Computing Corp. and its minority public shareholders.

Defendants contend that the fact that no mutually acceptable operating agreement was ever entered into or executed by the parties was due to the incompetency of the principals in NCS and the Defendants contend that under the circumstances they did everything possible to cooperate in the preparation of an agreement. Defendants also contend that as a matter of law they did not breach the Servicing Agreement, that all contractual obligations were performed and they assert, as affirmative defenses, accord and satisfaction, novation, estoppel, waiver, ratification, recission and substitution of a new and separate agreement, fraud and failure of consideration.

Defendants deny all of the Plaintiffs' factual allegations regarding the sale of the 350,000 shares of stock, and claim that the Plaintiffs cannot prove any of the essential elements necessary to establish liability under 10b–5. Defendants also contend that the 1971, 1972 and 1973 proxies were true and correct and that there were no material omissions. They deny all liability with respect to these solicitations. Certain Defendants also claim that the Plaintiffs are not entitled to sue derivatively because they allegedly failed to comply with the requirements of Rule 23.1 of the Federal Rules of Civil Procedure relating to making a demand upon the Board of Directors prior to bringing a derivative action.

The Defendants also deny any liability for any alleged violations of the Texas Securities Act or that they breached any alleged fiduciary duties, and claim that any alleged breaches of fiduciary duty are barred by the doctrine of laches and the statute of limitations.

Plaintiffs assert that for the alleged violations they have pleaded NCS and Booth, Inc. should be awarded substantial damages totaling millions of dollars. Defendants dispute Plaintiffs' computations of the alleged damages arguing that Plaintiffs and the corporation incurred no damages or only minimal damages. Defendants also contend that Plaintiffs' suit is brought derivatively on behalf of Booth, Inc., not NCS as NCS was merged out of existence, and therefore no recovery should or could as a matter of law be awarded to NCS.

This briefly summarizes the contentions of the parties and does not approach the particularity and detail used by the parties to fully explicate their positions.

The case exploded from these humble beginnings as each allegation in the complaint (and subsequent amended complaints) was analyzed, investigated and developed from all conceivable angles by the lawyers and the parties. According to the latest figures available (as of May 25, 1978), the litigation had expanded to include: depositions of 38 deponents totaling 12,730 pages of non-experts and 3,346 pages of experts; 431 deposition exhibits (1,243 pages) and 151 expert witness exhibits totaling 5,029 pages; 611 interrogatories totaling 210 pages; designation of 1,500 documents for trial (4,994 pages); and 18 pretrial briefs amounting to 1,503 pages, plus thousands of additional pages of motions, briefs, and orders totaling some 27 pages of docket entries.

The court has been extensively involved in overseeing the litigation; as I stated on February 24, 1978 (Transcript of Hearing February 24, 1978 at 14–15) "I feel confident that I could try this case from the standpoint of the plaintiffs or the defendants, and . . . I feel fully familiar with the case, both factually and substantively from the legal points involved . . ." In considering the proposed settlement of the derivative claims in this case I have considered all of the papers, briefs, depositions and the entire record. While I must, of necessity, make reference to the voluminous record and address the arguments raised by counsel I will attempt to limit my references and comments to the essential.

Like the universe it is hard to tell when or where this "big-bang paper case" will end, though eventually I am confident that some court will reach a decision that condenses this verbal universe into a decision that resolves the entire dispute. Regrettably, this order will not accomplish that lofty aim, as I will only condense into a managea-

ble settled form 'the derivative portion of the litigation.

## TENTATIVE SETTLEMENT OF THE DERIVATIVE ACTION

On January 9, 1978 all counsel appeared at a pre-trial hearing in preparation for the then scheduled January 16, 1978 trial. At the conclusion of the discussion of various pre-trial motions filed by the parties the court inquired: "Let me ask you, Mr. Fichtner, do you have any observations on it or do you think it would be helpful to have a settlement conference with the Court?" (Transcript of Hearing January 9, 1978 at 90). Mr. Fichtner, one of the lawyers for the Plaintiffs, indicated that he would be "most pleased" to participate in a settlement conference with the court. All other counsel either voiced no objection to the discussion of settlement, or expressly indicated their desire to participate. (Transcript of Hearing January 9, 1978 at 90–92). Mr. Kirk, representing Booth, Inc., a nominal defendant in the case, specifically requested that he be present during any settlement negotiations "because I feel that the Plaintiffs' case involves two different causes of action, one individually and one supposedly on behalf of the company I represent . . ." because he did not feel that the company had had an opportunity to make a disinterested business judgment as to the manner in which the case had been handled. *Id.* at 92. The court did not feel that Mr. Kirk's position barred his participation in settlement discussions with the court, and all parties recessed to participate at 3:30 that afternoon in an off-the-record settlement discussion with the court.

Settlement discussions continued over the next few days. At one point the court suggested to the Plaintiffs that they consider settlement of the derivative claims alone. Plaintiffs responded that they felt the entire litigation should be settled and they were not prepared to make a separate derivative claim demand. (See Transcript of Hearing June 5, 1978 at 70 for confirmation, although testimony not under oath). Booth, Inc. and the Defendants reached a tentative settlement of the derivative claims in the lawsuit and presented the tentative proposal to the court. The court indicated that the settlement as outlined appeared to represent a fair resolution of the derivative claims in the lawsuit, but the court would withhold entering formal tentative approval of the settlement until a disinterested majority of the Board of Directors of Booth, Inc. had had an opportunity to review the settlement and until the settlement proposal had been reduced to writing and signed by the participating parties. The proposal suggested to the court involved a payment to Booth, Inc. of approximately $400,000 cash, return to Booth of LNFC's holdings of Booth stock, and a release of certain indemnity claims. Plaintiffs violently objected to the settlement proposal.

Plaintiffs immediately objected, for the first time in the lawsuit, that Tim Kirk's participation in the lawsuit (along with his law firm of Saner, Jack, Sallinger and Nichols) on behalf of Booth, Inc. involved a conflict of interest. [For a complete analysis of this issue, see this court's order filed today discussing Kirk's alleged conflict of interest, Clark v. Lomas & Nettleton Financial Corp., 79 F.R.D. 658 (N.D.Tex. 1978)]. Over plaintiffs' objection the settlement offer was submitted to and approved by a majority of the board of directors of Booth, Inc. on January 11, 1978 (with Jack Booth not participating or being present at the Board meeting).

After the approval of the proposal by the board of directors of Booth, Inc. the court solicited the views of all counsel in preparing an appropriate notice to the stockholders. (See court's proposed draft of notice attached to order soliciting comment by all counsel, filed February 16, 1978). On February 16, 1978 the Plaintiffs filed extensive objections to the proposed notice and one week later Plaintiffs filed extensive objections to any court approval of the settlement. On February 24, 1978 the court conducted an on the record hearing to review the parties' objections to the notice to the shareholders.

An executed copy of the settlement agreement was filed with the court on February 21, 1978, and on March 3, 1978 the court entered an order giving preliminary court approval to the settlement of the derivative claims in Counts III, IV, VII, VIII, IX, X, XI and XII of Plaintiffs' Third Amended Original Complaint asserted on behalf of Booth, Inc. and approved a form of notice to be sent to the shareholders of Booth, Inc.

The court adopted many of the suggestions made by the Plaintiffs in preparing the final notice to the shareholders. The court set the hearing on final approval of the settlement on June 5, 1978, three months after the court tentatively approved the settlement and form of notice. The court changed the record date to conform with the date of the court's order, March 3, 1978. The court changed the time of the hearing to 10:30 a. m. on June 5, 1978 at Plaintiffs' suggestion, and the court was prepared to allot more than one day to the hearing, although the parties did not require the additional time. The court also included a more detailed description of the litigation, explained various terms of legal art so that they would be comprehensible to a layman, and made other changes consistent with the court's view that the notice sent to the shareholders should reflect the requests made by the parties for inclusion while being a fair and accurate statement of the litigation.

The court refused to send the notice to NCS shareholders as of April 2, 1973 or April 17, 1973 as requested by the Plaintiffs and as proposed in the court's original draft. On April 5, 1977 the court conducted a hearing on motions to dismiss the derivative counts on grounds that the plaintiffs lacked capacity to sue derivatively on behalf of "NCS as it existed prior to the merger." At that hearing Plaintiffs made conflicting statements about their cause of action. Mr. Mulloy stated:

"Our basic position is that our suit is as representative of NCS as it now exists— Booth is NCS, so we are seeking derivative action on behalf of NCS as it now

exists." (Transcript of Hearing April 5, 1977, p. 17, ll. 15–19)

On the other hand, when the court asked for clarification from Mr. Yeager, another attorney for the Plaintiffs, on this point he stated:

"New Booth is in and Old Booth is in." (Transcript of Hearing April 5, 1977, p. 17, ll. 1–2) (Old Booth refers to NCS as it existed prior to the merger with Booth)

After this hearing the court held in its order of April 29, 1977 that:

". . . the recovery which is sought is that for injury and damage to NCS as it existed prior to the merger which I have interpreted to mean New Booth (or in other words, Booth, Inc.) . . ." (Order of April 29, 1977, p. 6)

Plaintiffs argued in their objections to the proposed settlement and at the settlement hearing on June 5, 1978 that they were seeking to enforce through this derivative action the rights of NCS as it existed prior to the merger with Booth, that any recovery should go to the shareholders of NCS as of April 17, 1973, a date prior to the merger, and hence approval of the derivative claims settlement in this lawsuit should be received from the shareholders of NCS as of April 17, 1973.

■ A shareholder's derivative suit brought under Rule 23.1, Fed.R.Civ.Pro., is a procedure by which shareholders of a corporation can assert a right of action on behalf of the corporation when the corporation has refused a properly made demand to enforce the corporation's rights. *Koster v. Lumbermens Mutual Casualty Co.*, 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947). Any recovery made by the shareholders in a successful derivative action goes to the corporation and the shareholders thereby benefit through their participation in the ownership of the company. *Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); *Martens v. Barrett*, 245 F.2d 844 (5th Cir. 1957); *Green v. Victor Talking Mach. Co.*, 24 F.2d 378 (2nd Cir. 1928).

Justice Frankfurter explained the nature of a derivative suit in his dissent in *Smith v.*

*Sperling,* 354 U.S. 91, 99, 77 S.Ct. 1112, 1119, 1 L.Ed.2d 1205 (1957):

"The contrasting difference between a stockholder's suit for his corporation and a suit by him against it, is crucial. In the former, he has no claim of his own; he merely has a personal controversy with his corporation regarding the business wisdom or legal basis for the latter's assertion of a claim against third parties. Whatever money or property is to be recovered would go to the corporation, not a fraction of it to the stockholder. When such a suit is entertained, the stockholder is in effect allowed to conscript the corporation as a complainant on a claim that the corporation, in the exercise of what it asserts to be its uncoerced discretion, is unwilling to initiate. This is a wholly different situation from that which arises when the corporation is charged with invasion of the stockholder's independent right".

■■■ The capacity of a corporation to sue or be sued and hence the ability of its shareholders to sue on behalf of the corporation or to sue the corporation, is determined by the law of the state of incorporation, Rule 17(b), Fed.R.Civ.Pro.; *Beam v. Monsanto Co. Inc.,* 414 F.Supp. 570 (W.D. Ark.1976). A corporation can only exist according to state law and in the capacity authorized by the state. *Chicago Title and Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp.,* 302 U.S. 120, 58 S.Ct. 125, 82 L.Ed. 147 (1937).

Plaintiffs have always alleged that, apart from their individual claims, they asserted "(c)ertain counts . . . brought derivatively for and on behalf of NCS Computing Corp. as it existed prior to the merger." This language is contained in Plaintiffs' First, Second and Third Amended Complaints (See Appendix filed by Defendants LNFC et al. in Support of Motions to Dismiss, filed July 1, 1977, at 71, 79, and 125 for easy reference to all of Plaintiffs complaints).

■■ In May of 1973 NCS and Booth merged and NCS Computing Corp. "as it existed prior to the merger" ceased to exist.

Art. 5.06, Tex.Bus.Corp. Act (1976). The surviving corporation, Booth, Inc., possessed all of the rights and privileges, and was responsible for all of the liabilities and obligations of the merged corporation, including any claims existing at the time of the merger. *House Builders Inc. v. First Business Invest. Corp.,* 448 S.W.2d 829 (Tex.Civ. App.—Waco 1969, writ ref'd n. r. e.); *Morris Plan Life Insurance Co. v. Wells,* 387 S.W.2d 84 (Tex.Civ.App.—Ft. Worth, 1965, no writ). NCS no longer exists "as it existed prior to the merger" and the only entity that can enforce any rights NCS held prior to the merger is Booth, Inc. *Sun Pipeline v. Altes,* 511 F.2d 280 (8th Cir. 1975).

In arguing that the shareholders of NCS as of April 17, 1973 should participate in the settlement of this lawsuit, and in arguing that these individuals should be the recipients of any settlement proceeds derived from settling the derivative claims in this case, Plaintiffs are attempting to transform their lawsuit from a derivative action into a class action because the case law does not support Plaintiffs' position that shareholders of a corporation merged out of existence may bring a derivative action on behalf of the non-existent corporation.

The Plaintiffs would like the court to construe the word "derivative" in their Third Amended Complaint to read "class action", and they make this request, not after the court explicitly refused to entertain that interpretation on April 29, 1977 (Order filed May 2, 1978—a more complete discussion of this issue is contained in this order), but literally on the eve of trial and after the court has been presented with a settlement proposal that would dispose of the derivative claims in this lawsuit. The federal rules contemplate a definitive distinction between a class action, see Rule 23, Fed.R.Civ.Pro., and a derivative action, see Rule 23.1 Fed.R.Civ.Pro.; the court cannot read the word "derivative" in the Plaintiffs' Third Amended Complaint as meaning "class action." To do so would dramatically alter the nature of this lawsuit, create unfair surprise to all of the Defendants, and amend de facto Plaintiffs' Third Amended

Complaint to assert a class action on the eve of trial without requiring compliance with the provisions of Rule 23.

■ Plaintiffs failed to plead their lawsuit in a manner consistent with their apparent intended aim. While the federal rules permit and require liberal construction and amendment of pleadings, see Rule 15, Fed.R.Civ.Pro., the rules do not grant Plaintiffs or Defendants unlimited rights of amendment. This litigation has consumed over 5 years of litigation. It was specially set for trial in November, 1977 and was specially reset for trial in January of 1978 because the Plaintiffs requested additional time to complete expert discovery and to meet the court's pre-trial deadlines.

■ Upon reviewing the entire history of this case, all of the pleadings permitted to date by the court, and the schedules for completion of certain pre-trial matters set forth in numerous orders by the court, I find that justice does not require the type of amendment the Plaintiffs seek at this late date in the case. Plaintiffs failed to plead what they had intended; they must live with their case as plead. Therefore the court correctly sent notice to only the shareholders of Booth Inc. because, as I ruled on April 29, 1977 and as I just ruled again, the derivative action was brought on behalf of Booth, Inc. and therefore any settlement recovery goes to the corporation Booth, Inc.

## THE SETTLEMENT

■ Plaintiffs, as representatives of Booth, Inc., brought the derivative claims in this suit on behalf of the corporation. The corporation did not select these representatives of its cause of action; they were "self-chosen representative(s) and . . . volunteer champion(s)." *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 549, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The court must therefore determine whether any proposed settlement of the derivative claims is in the best interests of the corporation. This protects the corporation and its shareholders from unjust and collusive settlements. *Schlusselberg v. Colonial Manage-*

*ment Associates, Inc.*, 389 F.Supp. 733, 741 (D.Mass.1974); *Birnbaum v. Birrell*, 17 F.R.D. 409 (S.D.N.Y.1955).

■ Because the court is entrusted with the power to finally approve or reject a proposed settlement of a derivative claim, the court may approve a settlement that does not meet with Plaintiffs' approval. *Denicke v. Anglo California National Bank of San Francisco*, 141 F.2d 285 (9th Cir. 1944), *cert. denied*, 323 U.S. 739, 65 S.Ct. 44, 89 L.Ed. 592 (1944). Other cases in the state and federal courts have repeatedly recognized that the primary question the court must answer in evaluating a settlement of derivative claims is whether the settlement is fair, adequate and reasonable. The court should consider the objections of any shareholders or the Plaintiffs made to the settlement proposal, but the court is not required to reject a settlement proposal solely because the settlement has failed to receive consensus approval of the parties and shareholders. See *Russell v. Weyland*, 42 P.2d 381, 5 Cal.App.2d 259 (Cal.App. 1935); *Bysheim v. Miranda*, Sup., 44 N.Y. S.2d 15 (1943); *Goodwin v. Castleton*, 19 Wash.2d 748, 144 P.2d 725 (1944); *Pergament v. Frazer*, 93 F.Supp. 13 (E.D.Mich. 1950); *Stella v. Kaiser*, 218 F.2d 64 (2nd Cir. 1954); *Republic National Life Insurance Co. v. Easley*, 73 F.R.D. 658 (S.D.N.Y. 1977).

In the notice sent by the court to the shareholders of Booth, Inc. (Order March 3, 1978) the court disclosed the terms of the proposed settlement of the derivative portion of this case and described the proper procedure for objecting to any of the terms of the settlement. The court stated:

Any owner of Booth Inc. stock hereinabove described may appear at the hearing on June 5, 1978 in person or by attorney duly authorized in writing, and state objections they may have, if any, to the approval of the derivative settlement by the Court and entry of judgment by the Court dismissing and releasing all of the above-named defendants as to all derivative claims; provided, however, that no

such person shall be heard by the Court except as the Court may in its discretion allow, unless on or before 5:00 p. m. May 25, 1978 such person files his written notice of intention to appear, along with a written statement of his position to be asserted and grounds therefor, with the United States District Clerk . . ."

No shareholders of Booth, Inc. stock, other than the Plaintiffs, filed any objections to the proposed settlement by May 25, 1978 as instructed in the notice, and no shareholders of Booth, Inc. stock, except the Plaintiffs, appeared at the hearing on June 5, 1978 seeking to object to the settlement. Only the Plaintiffs have objected to the court's approval of this derivative settlement. The terms of the settlement are fully set forth in the settlement agreement filed with the court on February 15, 1978.

PLAINTIFFS' OBJECTIONS TO THE SETTLEMENT

Plaintiffs' primary objections to approval of the proposed settlement are: 1) the lack of independence and conflict of interest of the Board of Directors of Booth, Inc.; 2) the settlement is not fair, adequate and reasonable; 3) collusion in the negotiation of the settlement; 4) notice of the settlement should have been sent to NCS shareholders and the settlement proceeds should go to former shareholders of NCS stock, or a remedy should be constructed through the derivative action to undo the Booth/NCS merger and 5) the Saner, Jack Sallinger and Nichols law firm, as counsel for Booth, Inc., has a conflict of interest which should disqualify them as counsel in this case. I have rejected the Plaintiffs' fourth objection earlier in this order and I rejected the plaintiffs' request to disqualify the Saner firm in another order filed today. I will therefore discuss the Plaintiffs' first three objections to the approval of this settlement.

(1) Plaintiffs contend that the Board of Directors of Booth Inc. has a conflict of interest in approving any derivative settlement proposal. Plaintiffs note that: (1) the Board of Directors was directly opposed to the primary relief sought by the Plaintiffs

because it has consistently opposed recission of the Booth/NCS merger which the Plaintiffs contend was fraudulent, (2) Defendants Jack J. Booth and LNFC have controlled the Board of Directors of Booth, Inc. since May 10, 1973 because they have continuously owned in the aggregate more than 50% of the Booth, Inc. stock and the Directors are not "independent" and (3) the Directors voting to approve the settlement owe their positions as Directors to the Defendants Jack J. Booth and LNFC.

The "evidence" cited by the Plaintiffs does not support the allegations of conflict of interest. The Board of Directors of Booth, Inc. that approved the settlement of the derivative action was comprised of different individuals than those who occupied those positions at the time of the merger or on the date when the Plaintiffs sent their "demand" letter to the Board. (See pages 8–9 of the Memorandum Supporting Settlement filed by Booth, Inc. on May 25, 1978 for composition of the Board). The fact that LNFC and Jack Booth have controlled more than 50% of the stock of Booth, Inc. since May 10, 1973 does not, by itself, establish that the Board of Directors of Booth, Inc. were unable to make an independent judgment about the settlement proposal. Jack Booth was specifically excluded from the Board meeting and did not vote on the settlement proposal.

*Lasker v. Burks,* 567 F.2d 1208 (2nd Cir. 1978) cited by Plaintiffs to support their allegations of conflict of interest is distinguishable on its facts. In *Lasker* the Second Circuit reviewed the question of whether or not minority directors of a registered mutual fund who were nominated by the majority directors of the fund to be "independent" directors could terminate a non-frivolous stockholders' derivative action against the fund's majority directors and its investment adviser. The board of directors in that case consisted of twelve members, *Id.* at 1210, fn. 5, and the board determined that five of its members were "disinterested" and should decide whether or not the derivative lawsuit should be pursued on behalf of the corporation. The five "disinter-

ested" directors decided to seek dismissal of the suit from the court as a "business judgment". The Defendants moved to dismiss, and, after permitting discovery by the plaintiffs concerning the disinterested nature of the 5 minority directors, the court granted the requested dismissal. The Second Circuit reversed the trial court because it did not believe that a *minority* of directors appointed by a *majority* of a board of directors who, by their own admission, were interested parties, could truly make an independent business judgment with respect to *dismissal* of a case asserted on behalf of the corporation.

In *Clark* the majority of the 7 man Board of Directors of Booth, Inc. was disinterested. Jack Booth, the only defendant on the Board, was excluded from the Board meeting by Booth's lawyer.

The trial court in *Lasker* accepted the decision of the 5 members of the Board of directors because it concluded that they were disinterested, and made no independent review of the merits of the case, or the fairness, adequacy or reasonableness of what was, in effect, a settlement of the derivative action for no recovery. See *Lasker v. Burks*, 426 F.Supp. 844 (S.D.N.Y. 1977); *Lasker v. Burks*, 404 F.Supp. 1172 (S.D.N.Y.1975). In *Clark* the court has been continually involved in overseeing the settlement of the case, and in this order has made detailed findings concerning the reasonableness, fairness and adequacy of the settlement.

Finally the Second Circuit, in a footnote, indicated that its decision was limited to the facts and circumstances of this case. "We base our decision on the unique nature of the investment company and its symbiotic relationship with its investment adviser; we need not reach questions of the exercise of similar powers by directors of other types of corporations." *Lasker v. Burks*, 567 F.2d 1208, 1212 fn. 14 (2nd Cir. 1977). Booth is not an investment company and the Second Circuit's opinion would therefore not be applicable to the distinct facts of this case.

■ (2.) The test for determining whether or not the court should exercise its discretion and approve a proposed settlement of a derivative suit is whether the proposed settlement serves the best interest of the corporation. "A compromise will be approved as 'fair', 'reasonable', and 'adequate' if it serves that interest." *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y.1971); *Weiss v. Chalker*, 59 F.R.D. 533 (S.D.N.Y.1973); *Cannon v. Texas Gulf Sulphur Co.*, 55 F.R.D. 308 (S.D.N.Y.1972). Understandably the court does not undertake a trial on the merits to decide this question; the compromise was negotiated by the parties to avoid that result. *Schleiff v. Chesapeake and Ohio Railway Co.*, 43 F.R.D. 175, 178 (S.D.N.Y.1967); *Young v. Katz*, 447 F.2d 431 (5th Cir. 1971); *Neuwirth v. Allen*, 338 F.2d 2 (2nd Cir. 1964).

The case has been fully developed as can be observed by a brief glance at the 27 pages of docket entries and the complete pre-trial briefs filed by all parties at the insistence of the court. I have earlier cited the statistics developed by one of the parties concerning the extensive record in this case and at the court's suggestion, additional materials were filed with the court (including many extensive depositions and exhibits) for consideration by the court in connection with the June 5, 1978 settlement hearing. I cannot conceive of a more complete record at this stage of the proceedings.

In evaluating this settlement proposal the court has considered the entire record in this case on file with the court, and has evaluated the strength of the plaintiff's case balanced against the amount offered in settlement, recognizing that the fact that the settlement represents only a portion of the amount the Plaintiffs' claim or of the Plaintiffs' alleged potential maximum recovery does not, standing alone, establish that the offer is grossly inadequate or that it should be disapproved. *Schlusselberg v. Colonial Management Associates Inc.*, 389 F.Supp. 733 (D.Mass.1974); *Feder v. Harrington*, 58 F.R.D. 171, 176 (S.D.N.Y.1972).

The terms of the settlement are specifically set forth in the record in the settlement agreement. In summary that provides for payment in cash to Booth, Inc. of $415,000, the assignment by LNFC to Booth, Inc. of 258,983 shares of the common stock of Booth, Inc. which is all of the stock currently registered in LNFC's name, each party shall bear its own costs, and a number of the defendants waived their right of indemnification, if any, against Booth Inc. with all derivative claims asserted on behalf of Booth against the defendants being dismissed with prejudice.

Plaintiffs conclude that if the court approves this settlement, the case which began with a "bang" will end with a whimper. I have considered the amount of settlement in relation to what I consider to be Plaintiffs' probability of success on the merits, and I find that the amount and terms of the settlement are adequate, fair and reasonable. Plaintiffs have asserted causes of action on behalf of Booth which allege high damages. As the Plaintiffs and Defendants know, however, no contested lawsuit is ever a "sure thing". Plaintiffs would encounter numerous legal and factual problems in attempting to convince a jury and the court that they should be entitled to this pot of gold. The Defendants filed detailed motions to dismiss and motions for summary judgment, which the court considered and overruled as of the time they were made. The Plaintiffs' won a temporary victory, but it is unclear whether they would prevail on these legal and factual points once the trial began. The court also specifically reserved decision on two crucial issues in its order overruling most of the Defendants' motions to dismiss and for summary judgment: 1) the viability of maintaining certain asserted implied causes of action and 2) the sufficiency of the demand made upon the Board of Directors of Booth Inc. Thus at the trial court level, after extensive review of the motions to dismiss and for summary judgment, as well as the pre-trial briefs in the case setting forth all of the facts and legal contentions of the parties, my best judgment is that the Plaintiffs do not have a good chance of success on the merits of their derivative claims.

Secondly, after reviewing the depositions of Plaintiffs' experts I am convinced that even if the Plaintiffs could overcome the legal and factual hurdles which they face in this case (and which, for purposes of brevity only, I will not set forth at length, but will refer instead to the pre-trial briefs filed by the Defendants, their motions to dismiss, and the briefs of the Defendants in support of settlement for a summarization of the problems) on liability, they have serious factual problems with establishing their damages alleged in their Third Amended Complaint. For example, the deposition of Chester Mills indicates that there would have been no cost savings to NCS until 1976. Dep. of Chester Mills, Vol. II, Jan. 14, 1978, pp. 394–396. And the actual cost of L & N's data processing, which Plaintiffs' contend NCS could have done for less than $4.91/loan/year apparently exceeded that amount from 1970 through 1976. Dep. of David Kelly, p. 429, Ex. 260A. I am aware that at the June 5, 1978 hearing the Plaintiffs attempted to clarify Mills' testimony. My point in referring to these two examples is not to argue that in fact these figures are true, but merely to show that there are serious questions surrounding Plaintiffs' recovery of damages, and I must take these questions into account in determining whether the settlement is fair, reasonable and adequate.

I must also evaluate the length of trial and expense to the parties and balance that against the probability of Plaintiffs' success. Counsel, at various times, have indicated that this trial would likely last as long as 3 months, and I am inclined, based on my examination of the record, to agree with them. I am somewhat familiar with complex litigation, having completed only last year a 3 month anti-trust trial which had fewer defendants and fewer issues than this case.

In court attorney time cost for such a case would be staggering. Reviewing the Plaintiffs' request for fees filed April 24, 1978 and, for purposes of estimation only, using it as a very rough guide to the legal

expenses in this case that might be incurred by Booth, I could foresee Booth's legal expenses alone amounting to $500,000 and that would not include possible indemnification for the fees of other defendants in this litigation, all of which Booth risks with the distinct possibility of no recovery if the settlement is not approved and trial is commenced.

There are also a number of attorney conflict problems that I have perceived could arise in this case, aside from the question raised by the Plaintiffs concerning the disqualification of the Saner firm. The Defendants took the deposition of Jay Fichtner, one of the principal attorneys for the Plaintiffs, and it is not inconceivable to me that the Plaintiffs might feel it necessary to call him as a fact witness in this case. In addition, the Locke, Purnell firm was heavily involved in conducting the affairs of some of the Defendants and their attorneys were involved in some of the transactions that occurred in this case (Busbee and Rogers, for example, who are represented by separate counsel, are members of the Locke, Purnell firm and are defendants in this suit because of their alleged involvement in the transaction). I could conceive that members of the Locke, Purnell firm other than Busbee or Rogers might need to be called to testify on behalf of the Defendants in this case. I raised these problems with all of the attorneys at the April 5, 1977 hearing and again in the fall of 1977 (see order filed October 19, 1977). Although the attorneys did not feel that a problem existed, if it arose at trial it could present serious problems under the Code of Professional Responsibility. See *Supreme Beef Processors, Inc. v. American Consumer Industries Inc.*, 441 F.Supp. 1064 (N.D.Tex.1977). This might result in trial postponement, disqualification of attorneys or even dismissal of the case, all to the detriment of Booth Inc.

Finally, I have considered that the Plaintiffs may not be fair or adequate representatives of Booth Inc.'s corporate interests, either at trial or in these settlement discussions. This point was first brought to my attention on January 3, 1977 in the Defendants LNFC, etc.'s brief in support of motions to dismiss, where Defendants pointed out that as Plaintiffs were asserting derivative *and* individual claims, they might impermissably use the leverage acquired through their control of the derivative suits to secure a favorable settlement of their individual claims, while at the same time failing to respect the interests of the corporation. Plaintiffs have repeatedly indicated that they saw no conflict with this representation, and I am not suggesting that such a conflict exists at this time. I can conceive that if this settlement was rejected that such a conflict might arise later in these proceedings, and I did observe that the Plaintiffs refused to even consider settlement of the derivative case apart from the individual claims. Transcript of Proceedings, June 5, 1978, pp. 70–71. The court can guard against this potential for conflict by closely overseeing the settlement of the lawsuit, and I believe that I have accomplished that aim.

■ It is my best judgment, after a thorough review of the entire record, and my conclusion that the settlement amount and the terms are adequate, fair and reasonable, given the Plaintiffs' chances of success, the complexity, length and expense of further litigation, the knowledge and experience of counsel who have spent 5 years with this case (as I have) and taking into consideration the opposition of the Plaintiffs and the lack of opposition from any other shareholder of Booth Inc.

■ (3) Finally, Plaintiffs complain that the settlement was collusive. I have reviewed the depositions of Kirk, Nichols, Booth, Osborne and Neely and I can find no evidence that the settlement was collusive in nature. All of the evidence suggests to me that the settlement was rather the result of hard bargaining between the parties. Plaintiffs suggest that the evidence shows that Booth's sole aim in this settlement was to eliminate any possibility of liability against Defendant Jack J. Booth. The only "evidence" of which I am aware to this effect is the statement by Mr. Wolfe in which he recounted his version of the settle-

ment negotiations. See Transcript of Hearing, June 5, 1978. This monologue was not recited under oath, and I do not feel that it can be accepted by the court as evidence of anything except as counsel's argument to the court. I pointed out this problem to counsel (Transcript of Hearing June 5, 1978 at 66) but counsel elected to pursue the statement in the form now present in the record, and not to take the stand under oath where the Defendants would have the opportunity of effective cross examination.

Even if this statement were admissible evidence, however, Mr. Kirk's recollection of those events (which is in the record, see Kirk Deposition May 10, 1978 filed May 25, 1978, at 53, 11.16–17) and my own recollection of some of the events described by Mr. Wolfe differs from Mr. Wolfe's description. I find that Booth, Inc. was negotiating a fair settlement for the corporation and was not framed with a view to insulating Jack J. Booth from liability.

## ATTORNEYS FEES

The Fifth Circuit has expressly approved the reimbursement of *reasonable* attorney's fees and expert witness' fees incurred in maintaining a derivative action which results in the creation of a fund benefitting the corporation. *Wolf v. Frank*, 477 F.2d 467 (5th Cir. 1973); *Wolf v. Frank*, 555 F.2d 1213 (5th Cir. 1977). The court should take into consideration the following 12 factors in analyzing the requested attorneys' fees: (1) the time and labor required, (2) the skill requisite to properly perform the legal services, (3) preclusion of other employment by the attorney due to acceptance of the case, (4) the novelty and difficulty of the questions presented, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client and (12) awards in similar cases. *Wolf v. Frank*, 555 F.2d 1213 (5th Cir. 1977); *Rainey v. Jackson State*

*College*, 551 F.2d 672 (5th Cir. 1977); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). I have considered all of these factors in making my fee award determination in this case and more fully detail my views below.

Plaintiffs have requested counsel fees totalling $290,000 and reimbursement of expenses of $95,134.85 to be paid out of the settlement fund which Plaintiffs estimate totals $690,169.44. See Plaintiffs' Petition for Award of Fees and Costs, filed April 24, 1978 at 1 & 12. They claim to have expended a total of 10,108.5 recorded hours in the prosecution of this litigation, for which they would normally charge $964,975.00 on a non-contingent basis, and they estimate that 75% of the total hours expended are attributable to the derivative claims in this case, or 7,581.375 hours totalling $723,731.25, the remainder being attributable to the individual claims in this case which are not included in this settlement. Plaintiffs request compensation in the amount of only 40% of this total, or the $290,000 figure. Plaintiffs apparently request compensation for the full amount of their expenses. Defendants and Booth, Inc. have filed numerous objections to this award which I will address as I discuss the *Johnson* factors which I have considered in reaching my decision.

### 1. *Time and Labor Required.*

The Fifth Circuit has indicated that the number of hours claimed to have been expended in a case, here 10,108.5 hours, should not be the sole basis for determining a fee, and in fact Plaintiffs do not request full compensation for these hours, reducing their claim to 7,581.375 hours which they attribute to the derivative claims, and then arbitrarily requesting compensation for only 40% of that amount, or by their calculation $290,000. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974). I am convinced that the Plaintiffs have spent many hours preparing this case; I know that I have spent many hours in hearings, considering motions, and preparing orders. I perceive a real problem,

however, in allocating the time as the Plaintiffs' request, 75% of the derivative claims and 25% to the individual claims, and in allocating the costs, sometimes at the 75% figure and other times at another figure (for example, the expenses of Jacob Heffler are allocated at 85% to the derivative claims). Plaintiffs admit that this is only an estimate and I can find no supporting data in their fee requests for making any reasonable independent determination that their estimate is correct, or even substantially correct. Plaintiffs admit that Counts I and II (the individual claims for sale of securities) are virtually identical and would require development of essentially the same proof as Counts III and IV (derivative claims for sale of securities). Many of the facts, I find in reviewing the Third Amended Complaint, alleged in the derivative counts are also part of the individual claims, and would have to be proven to establish the individual claims for relief. I am not, therefore, convinced that the Plaintiffs' estimate is accurate, and Plaintiffs' should have kept accurate time records which distinguished between the time spent on the derivative claims, the time spent on the individual claims, and the time which the Plaintiffs believed was attributable to both the individual and derivative claims. This type of allocation should also have been used in recording the costs incurred in the litigation.

The Plaintiffs did exert substantial labor and effort in preparing this case for trial, including, but not limited to, three amended complaints, collection and inspection of thousands of documents, numerous oral depositions and compliance with the terms of this court's pretrial orders. In my judgment, however, in reviewing the settlement of this case, the Plaintiffs were expending substantial effort with only a very slim chance of recovery of the amounts stated in the Plaintiffs' Third Amended Complaint and only a minimal chance of recovery of any amount in connection with the derivative claims. Thus, with these odds, it is my judgment that the Plaintiffs expended an excessive number of hours and effort on the case. This evaluation would also apply to the costs incurred by the Plaintiffs.

## 2. *Novelty and Difficulty of the Issues.*

Plaintiffs assert that many of the issues presented by this case were novel and difficult, and therefore a substantial attorney fee award such as they request is justified. While I agree that there were some difficult issues in this case, I cannot ignore the fact that some of the issues might have been avoided (for example, the statute of limitations questions, the sufficiency of the demand on Booth, and the existence of implied remedies under Section 10 and 14). I am not suggesting that Plaintiffs erred in their conduct of the case, but I must review the conduct of the case, as overseer of the settlement, to determine if the fee request is reasonable.

I also believe that the Plaintiffs had weak legal arguments on a number of factual and legal points presented in the Defendants motions for summary judgment and in the motions to dismiss. I am not the ultimate arbiter of those questions if any of the parties were to appeal my decision on any of those issues should the case proceed to trial, but I believe it is important for me to review the strength of Plaintiffs arguments in determining whether the issues presented to me were really novel and complex, or whether other courts had either settled or marked the pathway for decision on these questions.

My judgment on this factor, however, has not had an overriding influence on my fee determination, as I recognize that a securities case, by its very nature, is a complex animal, and a substantial fee is justified for successful pursuit of the case.

## 3. *Skill Requisite to Perform Proper Legal Services.*

I have thoroughly examined the attorneys' work product in this case and observed the conduct of the Plaintiffs' attorneys in this case and I can say without any qualification that they all possess superior ability, and that a securities case, of the type involved here, demands the top quality

representation that the Plaintiffs' attorneys brought to bear in this case. On the other hand, I do not feel that this factor is determinative of what amount of fees should be awarded in this case, though obviously high quality work should be compensated, but should rather be considered along with all of the other factors.

### 4. *Preclusion of Other Employment.*

I am aware that this suit has, in all likelihood, precluded other employment on behalf of the Plaintiffs, though the record does not reflect any specific instances of employment rejected by the Plaintiffs because of the pendency of this suit. On the other hand, Plaintiffs chose to accept this employment knowing that they might not recover any amount on behalf of the corporation or might recover less than they had plead, and knowing that pursuit of a securities case involves a substantial expenditure of time and effort. They were also aware that the court would have to approve their requested attorneys' fees, and that they might not be awarded fees which equalled what they would bill a regular client for the number of hours expended in the case, or equal their requested fee.

### 5. *The Customary Fee.*

Here I will discuss the customary fee and awards in other cases, as I feel these two factors are related in a securities derivative action. In evaluating the customary fee for this type of case I have taken into account the stage at which this derivative action was settled, hourly fees requested by the Plaintiffs for their lawyers and assistants, my knowledge of the legal community and the customary fees charged by lawyers and experts as well as the evidence in this case with regard to these items, and fee awards in other cases. The customary fee is also tied to the benefit conferred on the corporation and it has been held that that is the principal factor, though not the only factor, in determining a fee award in a derivative action. See *Murphy v. North American Light and Power Co.*, 33 F.Supp. 567, 570 (S.D.N.Y.1940); *Newman v. Stein*, 58 F.R.D. 540, 550 (S.D.N.Y.1973); *Derdiarian v. Futterman Corp.*, 254 F.Supp. 617, 620 (S.D.N.Y.1966); *In re King Resources Co. Securities Litigation*, 420 F.Supp. 610, 630 (D.Colo.1976); *Voege v. Ackerman*, 70 F.R.D. 693 (S.D.N.Y.1976); *Blank v. Talley Industries Inc.*, 390 F.Supp. 1 (S.D.N.Y. 1975).'

In reviewing these cases and others, as well as commentaries on the subject, I find that the "usual" recovery approximates 20% of the benefit received by the corporation. Cole, *Counsel Fees in Stockholder's Derivative and Class Actions-Hornstein Revisited*, 6 Univ.Rich.L.Rev. 259, 281 (1972); Kennedy, *Securities Class and Derivative Actions in the United States District Court for the Northern District of Texas: An Empirical Study*, 14 Hous.L.Rev. 769, 820 (May 1977); Hornstein, *The Counsel Fee in Stockholders' Derivative Suits*, 39 Colum.L.Rev. 784, 813, n.187; Mowrey, *Attorney Fees in Securities Class Action and Derivative Suits*, J.Corp.Law 267, 349 (Winter 1978). In appropriate circumstances, however, courts have departed from this "customary" approach and awarded higher or lower fees. *In re Equity Funding Securities Litigation*, 438 F.Supp. 1303 (C.D.Cal.1977) (fee of 11% of recovery); *Zinman v. Avemco Corp.*, CCH Fed.Sec.L.Rev. P. 96, 325 (E.D.Pa. 1978) (fee 50% of recovery). So I do not consider the percentage recovery in other cases a strict rule, but more a guideline.

I also consider the "usual" fee for hourly compensation to be a guideline and not fixed. I note, however, that few, if any, courts use the hourly compensation rate times the number of hours spent on the case by the Plaintiffs as the method of determining appropriate fees in a securities derivative count; that is certainly not the ultimate fee test. If I adopted that procedure here, for example, according to the Plaintiffs I would be awarding a fee to the Plaintiffs that would exceed their estimate of the recovery by over $300,000.

### 6. *Fixed or Contingent Fee.*

There is no dispute that Plaintiffs only recovery of fees for the work expended on

the derivative portion of this lawsuit will be from the funds awarded to the Plaintiffs by the court, and that therefore their recovery of fees is contingent. I have taken this into account in computing the fees awarded, recognizing both that the Plaintiffs have expended many hours of uncompensated time (to date uncompensated) which have helped result in a recovery to the corporation, and that this will be the sole source of Plaintiffs' fees.

### 7. Time Limitations.

No time limitations imposed by the client occurred in this case to my knowledge, though, as pointed out by the Plaintiffs, the court did impose certain time limitations on the parties to bring this litigation to a close as it had been pending for a number of years. Contrary to the Plaintiffs' assertions, the court, in reviewing these time limitations, does not find them severe. In fact, the first pretrial order entered in this case in 1977, as I recall, was drawn with reasonable time limitations which were amended a number of times to accommodate the Plaintiffs, including postponement of trial for 2½ months, over the objections of the Defendants who were prepared for trial in November, 1977. In a case that has progressed for 5 years and is one of the oldest cases on my docket, I do not feel persuaded that the court should award "some premium" for this effort, and though I do not ignore Plaintiffs efforts and take them into account in my decision, I don't feel they deserve an extra bonus as Plaintiffs suggest for any "hardship" suffered.

### 8. Amount Involved/Results Obtained.

This is one of the most important factors in my fee and cost award decision, because the lawsuit was brought to benefit the corporation, not to benefit the lawyers. The only benefit Plaintiffs claim they conferred on Booth, Inc. is the $415,000 cash and 258,983 shares of Booth, Inc. Common Stock (valued approximately by the Plaintiffs at $275,169.44) and I will accept their evaluation of the settlement for the fee award as any other benefit to the corporation is ad-

mittedly speculative, and hard to assess in accurate dollar amounts. I note, however, that for purposes of my evaluation of the reasonableness, adequacy, and fairness of the settlement I have taken into account the cancellation and waiver of some Defendants' claims for indemnification, which have been speculated to be worth from between $250,000 to $400,000. Plaintiffs do not request that I consider this amount in awarding their fees, and therefore I do not consider it.

Booth has incurred expenses as a result of this litigation and is likely to incur additional expenses to indemnify officers and directors under the premerger corporate charter of NCS. In some cases I believe that these expenses were imposed on Booth by the Plaintiffs, who brought the action on Booth's behalf, because certain Defendants were joined in the litigation which may not have been properly before the court.

Plaintiffs have also vigorously opposed the settlement (including, I note, one appeal already to the Fifth Circuit for which they are claiming attorneys' fees and costs in their petition for fees from the settlement proceeds), asserting that the proceeds should not go to Booth, Inc., claiming that the settlement amount was too low, and refusing to consider settlement of the derivative claims apart from their individual claims. Thus I believe that the Plaintiffs were not at all times acting in the best interests of the corporation, and it would not be proper to fully compensate them for pursuing interests adverse to the corporation they benefited, Booth, Inc., from the settlement proceeds to be received by Booth.

On the other hand, their efforts have helped prepare the case for trial which has resulted in a settlement favorable to Booth, Inc. and therefore their efforts should not be ignored, as counsel for Booth, Inc. suggests in its brief. I am not convinced, however, that the actions of the Plaintiffs contributed solely to this settlement; in fact, settlement would not have come about if Tim Kirk had not negotiated with the Defendants on behalf of Booth, Inc. And

as I have concluded that the settlement is fair, reasonable and adequate for Booth, I cannot look as favorably on Plaintiffs' request for fees when they did not actively pursue the settlement that was negotiated, but instead incurred fees and expenses actively opposing the settlement. I must also take all of this into consideration when I evaluate Plaintiffs' request for cost reimbursement and I have done so.

■ In making my award, I also note that Mr. Fichtner, one of the Plaintiffs' principal attorneys, has been a shareholder of Booth, Inc. as well as a Plaintiffs' attorney in this lawsuit (Mr. Fichtner's deposition was even taken in this case). I have a serious question as to whether a stockholder or his law firm instituting a derivative action should be allowed compensation as an attorney in the litigation. *Eisenberg v. Central Zone Prop. Corp.*, 1 A.D.2d 353, 149 N.Y.S.2d 840 (1956); *Giesecke v. Pittsburg Hotels*, 82 F.Supp. 64 (W.D.Pa.1949), *aff'd*, 180 F.2d 65 (3rd Cir. 1950). I have commented elsewhere in this opinion on other problems that can occur with this type of representation.

9. *Experience, Reputation, and Ability of the Attorneys.*

10. *Undesirability of the Case.*

11. *Nature and Length of Professional Relationship with Client.*

I have no doubts about the excellent experience, reputation, and ability of the attorneys as is evidenced by the high quality of their work present in this record. I believe the case was somewhat undesirable, not for the reasons cited by Plaintiffs in their brief, but because I feel Plaintiffs have and still are overestimating their chances of success on the merits at trial. I have not placed any special emphasis one way or the other in my award of fees and costs on any prior relationship with Plaintiffs' clients as it is undisputed that none existed prior to the institution of this suit.

12. *Awards in Similar Cases.*

■ I have already discussed my thoughts on this subject under *Customary Fees*, as these two categories, in my mind, overlap in this type of case. I am aware that a customary contingent fee in many cases is 33⅓ of the recovery, and that a number of cases apparently adopt this percentage as a proper means of determining the fee award. See, e. g., *Wolf v. Frank*, 555 F.2d 1213 (5th Cir. 1977); *Pearlman v. Feldmann*, 160 F.Supp. 310 (D.Conn.1958). I believe that each case must be evaluated on its own merits, taking into account what other courts have done in the past, but finally making an appropriate award for this case.

■ After considering all of these factors in relation to the Plaintiffs' request for fees and costs, I hereby award the Plaintiffs' fees in the amount of $167,780.00 and expenses in the amount of $72,300 to be paid from the settlement proceeds to the Plaintiffs, and after considering all of the Plaintiffs' objections, the briefs in the case, the settlement proposal, my expense and fee award to the Plaintiffs, the hearings conducted by the court, and all of the material on file in the record in this case I conclude that the settlement is fair, reasonable and adequate, that there is no evidence of collusion in the settlement, that the Board of Directors of Booth, Inc. did not lack independence or have a conflict of interest, that the Saner, Jack, Sallinger and Nichols law firm did not have a conflict of interest in representing Booth, Inc. in this litigation, and that the notice of the settlement should not have been sent to the NCS shareholders and that no settlement proceeds should go to former NCS shareholders as suggested by the Plaintiffs.

I hereby approve the settlement filed with the court on February 15, 1978 in all respects with the qualification that the Plaintiffs are awarded the fees and expenses set forth above from the settlement proceeds. I hereby sever the individual claims in this case, Counts I, II, V, and VI from the derivative claims involved in this settlement (Counts III, IV, VII, VIII, IX, X, XI, and XII), and hereby set for trial on the merits, specially set number one on the

docket, Counts I, II, V and VI, on November 6, 1978, and I will enter a final judgment on the derivative counts by separate order. Under the provisions of Rule 54(b), Fed.R.Civ.Pro., I find that there is no just reason for delay in entering a final judgment as to the derivative claims in this case. I indicated in my Order of March 3, 1978 Tentatively Approving the Settlement that I would sever the derivative claims and enter a final judgment, and, as these claims are finally settled and the settlement is completely independent of the individual claims in this case, I see no reason why I should not, as I indicated I would, enter a final judgment as to this part of the case.

I have taken longer than I had hoped to recount my reasons for reaching this result, but the ever expanding universe of paper, at least with respect to this portion of the litigation, is now drawing to a close, with a result that is favorable to Booth, Inc.

It is so ORDERED.

See also D.C., 79 F.R.D. 641.