Russell J. MOKHIBER, on behalf of the FORD MOTOR COMPANY, Plaintiff,

v.

Roy M. COHN, Saxe Bacon & Bolan, P.C., Allan M. Pollack, Orenstein, Snitow, Sutak & Pollack, P.C. and Ford Motor Company, Inc., Defendants.

No. 81 Civ. 6672 (WK).

United States District Court, S.D. New York.

May 15, 1985.

Public Citizen Litigation Group by Alan Morrison, Washington, D.C., Sive, Paget & Riesel, P.C. by David Paget, New York City, for plaintiff.

Saxe, Bacon & Bolan by Louis Biancone, New York City, for defendants Roy M. Cohn and Saxe, Bacon & Bolan.

Cole & Deitz by Robert E. Kushner, New York City, for defendants Allan M. Pollack and Orenstein, Snitow, Sutak & Pollack.

Hughes, Hubbard & Reed by George A. Davidson, New York City, for defendant Ford Motor Co.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

In this diversity action plaintiff (hereinafter the "instant plaintiff"),[1] a shareholder of the Ford Motor Company (the "Company"), a Delaware corporation with its headquarters in Michigan, seeks to require certain attorneys to repay to the Company the sum of $230,000 (plus pre-judgment interest) claimed to have been improperly received by them in an allegedly unauthorized settlement of a previous derivative suit.

The attorneys involved in the previous litigation are two firms, Saxe, Bacon & Bolan, P.C. (the "Cohn firm"), principally represented by Roy M. Cohn, Esq., and Orenstein, Snitow, Sutak & Pollack (the "Pollack firm"), principally represented by Allan Pollack, Esq. These attorneys are hereinafter collectively referred to as the "defendant lawyers." In 1978, the defendant lawyers were retained by a partnership known as Bader and Bader, and two other Company stockholders, to institute a derivative action (the "Bader action") on behalf

---

1. On October 11, 1984 we granted a motion to substitute Russell J. Mokhiber as plaintiff due to the decease of the original plaintiff, Ida M. Cohen. Both will be interchangeably referred to as the "instant plaintiff."

of the Company and all its stockholders.[2] After approximately 18 months of litigation before the New York courts, that action was conditionally dismissed on grounds of *forum non conveniens*, and Michigan was designated the appropriate forum. No suit was ever filed in Michigan, but about four months after the New York dismissal the dispute was settled. The only obligation assumed by any defendant was the Company's agreement to pay $230,000 to the plaintiffs' attorneys. It is that sum which the instant plaintiff seeks to recover on the Company's behalf.

## THE BADER ACTION

The defendant lawyers claim to have relied upon two sources of information in drawing their complaint in the *Bader* action. The first source was a high company official (whose identity has, for obvious reasons, been kept confidential, and who will hereinafter be referred to as the "informant") who was extensively interviewed by James J. Crisona, Esq., a member of the Pollack firm and a former Justice of the New York Supreme Court. The informant, through Mr. Crisona, is said to have convinced the defendant lawyers that they had a valid claim based on various revelations of misconduct by Henry Ford II, the then Chairman of the Company's Board of Directors.[3] The second source of information was an announcement by the United States Department of Justice that it was conducting an investigation into widespread rumors that the Company had made illicit payments to officials of the Indonesian Government. Although announcement of the Justice Department's investigation preceded the *Bader* action, the original complaint relied exclusively on the first of the above sources, while subsequent amended complaints relied on both.

The allegations of the third amended (and ultimate) complaint may conveniently be divided into two categories: those counts (1, 2, 3, 4, 6, 7, 9 and 10) apparently relying upon the informant's revelations; and those counts (5 and 8) apparently relying upon the Justice Department's announcement. The "informant" counts allege that Mr. Ford, with the acquiescence of several Directors, engaged in a wide variety of self-dealing, waste and mismanagement: expenditures in excess of $1,000,000 per year for an apartment in the Carlyle Hotel in New York City for the exclusive use of Mr. Ford and his family; the purchase of two residences in London for his personal use; obtaining kickbacks amounting to $750,000 in connection with contracts granted to a co-defendant and a corporation affiliated with the latter; causing the Company to enter into various overpriced contracts, on condition that the contractors provide furnishings for Mr. Ford's personal residences; accepting, as Chairman of the Board, excessive annual remuneration in the amount of $992,000 for which he performed "little, if any, services"; receiving payments for providing advance information of the Company's real estate investments; and causing the Company to invest over $50,000,000 in a Philippines project in exchange for a $2,000,000 cash payment made to an otherwise unidentified "defendant."

The Justice Department counts alleged that Mr. Ford caused the Company to pay a $1,000,000 bribe to an official of the Indonesian government in exchange for favorable action on a contract for which the Company was bidding; that he tried to cover up the payment by forging, altering and back-dating contracts, books and records; and that the Company's accounting firm concealed and destroyed corporate

**2.** The action was initially brought by one John F. Lang as trustee for the benefit of several children of a Cohn firm partner. Mr. Lang was joined in subsequent amended complaints by other Company stockholders and eventually dropped out of the litigation, apparently in response to the Company's motion to disqualify the Cohn firm. (*See infra* at 619.) The plaintiffs named in the final complaint are those mentioned in the text.

**3.** Other members of the Board were also involved in the informant's revelations, but for the most part they were simply accused of acquiescing in Mr. Ford's alleged wrongdoings.

financial records pertaining to the alleged bribe.

These allegations were supplemented by the *Bader* plaintiffs' answers to interrogatories which, so far as are here particularly relevant, charged Mr. Ford with personally having misused several million dollars of company assets. The relevant interrogatory answer was organized under several headings: "Transportation"; "Personal Luxuries for Henry Ford II"; "Personnel and Nepotism"; and "Miscellaneous Unauthorized and Illegal Corporate Enterprises." It charged that Mr. Ford had used corporate funds and aircraft to transport furnishings across the ocean for use at his residences and the residences of his close friends, specifically, an ornate fireplace, pet dogs and cats whenever their owner ("his close and personal friend") "felt her pets were in need of a change in climate." It alleged that Mr. Ford used Company aircraft for his personal transportation and the transportation of his family and friends; and that he maintained six to nine corporate limousines and drivers in New York for his personal use and the personal use of other directors, family and friends. In addition to causing the Company to maintain a private apartment at the Carlyle Hotel, as alleged in the complaint, the Interrogatory answer asserted that the Company kept for Mr. Ford's use in Dearborn, Michigan a sauna bath, private gym and full-time masseur, private dining room staffed by Company personnel ("It is estimated that each lunch Mr. Ford eats costs the shareholders approximately $200.00 per person ...") and that the Company was preparing a similar "personal setup" in Detroit with furnishings said to cost several million dollars. Mr. Ford was said to have staffed the home of his "close and personal" friend with Company personnel, and to have caused the Company to hire her family and former employees when they were not the most qualified applicants for their jobs. The Interrogatory answer further claimed that the Company "[p]icked up the tab for bird hunting in Scotland, for Mr. Ford and his friends," and paid for a large private party he threw in 1977. Finally, the Interrogatory answer charged Mr. Ford and his family with misusing the Company's telephone credit card.

The merits of the foregoing accusations were never addressed in the New York litigation. Indeed, the defendants in the *Bader* action never interposed an answer, the litigation being exclusively addressed to an omnibus defense motion demanding: dismissal of the third amended complaint for plaintiffs' failure to make a proper demand upon the Board of Directors; dismissal on grounds of *forum non conveniens;* or, in the alternative, disqualification of the Cohn firm, and posting by plaintiffs of a bond for costs. Justice Fraiman of the New York County Supreme Court ordered the *Bader* plaintiffs to post a $250,000 bond, but denied all other relief. The Company appealed to the Appellate Division. That court, leaving all other questions undecided, reversed on the issue of *forum non conveniens* and directed that the complaint be dismissed on the condition that all the defendants agree to accept service of process in the State of Michigan and to waive any jurisdictional or statute of limitations defenses should any of the causes of action in the final *Bader* complaint be there refiled. *Bader & Bader v. Henry Ford II, et al.* (1st Dep't 1979) 66 A.D.2d 642, 414 N.Y.S.2d 132. The *Bader* plaintiffs appealed to the New York Court of Appeals, which, on September 18, 1979, dismissed the appeal. 48 N.Y.2d 649, 421 N.Y.S.2d 199, 396 N.E.2d 481.

## ACTIVITIES WITHIN THE COMPANY DURING THE PENDENCY OF THE BADER ACTION

Although none of the allegations of the *Bader* complaint were litigated, they were not wholly without impact on the Company. When the Attorney General of the United States had announced his investigation into the Indonesian allegations, the Company's Board of Directors had established a special audit committee of its members to conduct its own investigation into those allegations. When the *Bader* complaint was filed the Board expanded the authority of that

special committee, instructing it to investigate the *Bader* allegations as well. The special committee was provided with copies of the several *Bader* complaints and with the above-described answers to Interrogatories. By the time the *Bader* complaint was conditionally dismissed by the Appellate Division, the special committee's labors had produced at least two results which are here claimed to be relevant: (1) Mr. Ford had been billed for and had paid the sum of $34,585 with respect to unauthorized expenditures for which the special committee had found him to be responsible; and (2) other personnel had been billed for and paid $11,215.40 for other unauthorized expenditures. Shortly thereafter, the special committee caused the Company to circulate four directives which restated, clarified or modified regulations concerning use of Company aircraft in the United States, use of Company car and driver service, provision of personal services by the Company, and "use of Shoreham West apartment." These directives were re-circulated in May of 1980.

According to statements attributed to Mr. Ford, his repayments were with respect to personal use of the suite in the Carlyle Hotel which had been mentioned in the *Bader* complaint and in the *Bader* plaintiffs' answers to interrogatories. The repayment of $11,215.40 by other Company personnel appears to have been unrelated to anything referred to in the *Bader* litigation. The four directives seem related to the allegations of the *Bader* complaint.

According to the Company, these directives, as well as the Audit Committee's

investigation of the *Bader* allegations, "resulted in increased attention among [the Company's] Board of Directors, officers and employees to the policies and procedures of the Company, including the continuing requirement to maintain complete and accurate records of the use of corporate facilities and assets." [4] However, it is not contended that they had any identifiable impact on the rate of the Company's expenditures, or that any monetary savings from such increased attention have been identified. Moreover, although the new directives had been in place for approximately four years when discovery in the instant action was closed, there is no indication in the record that the actual conduct of any officer or employee was influenced by the directives, or that they had significant effect upon the Company's total expenditures for any accounting period. [5]

## NEGOTIATIONS FOR SETTLEMENT

When the Appellate Division conditionally dismissed the *Bader* action, the defendant lawyers and the Company found it in their respective interests to enter into settlement negotiations rather than pursue the litigation. Although the defendant lawyers remained convinced that the informant had provided them with an adequate basis to institute a lawsuit, they had by this time realized that he was incapable of leading them to any evidence of legally cognizable wrongdoing by Mr. Ford or any other officer, director or employee of the Company. [6] Similarly, their reliance on the Justice Department had been vitiated by the inves-

---

**4.** The Company's Answer to Interrogatory 4(d) dated April 18, 1983. One of these directives, however, contained exceptions which had the effect, as a practical matter, of making it inapplicable to Mr. Ford. The directive concerning use of car and driver service provided (for reasons of security) for full-time car service to the Chairman of the Board, President and President of the Executive Committee and their passengers, regardless of whether there existed a business purpose for such usage.

**5.** This circumstance is important because of a peculiarity in the instant litigation. The Company's attorneys, apparently feeling obligated to support a settlement arrived at by their client,

have fully cooperated with the defendant lawyers in trying to establish that some modicum of benefit accrued to the Company as a result of the *Bader* action.

**6.** Several considerations—apart from the fact that extraordinarily able counsel were willing to settle a multi-million dollar lawsuit for a pittance—compel the conclusion that the defendant lawyers knew they had no case:

1) The affidavits submitted by the defendant lawyers in the instant action (Pollack Affidavit dated August 31, 1982; Cohn Affidavit dated August 3, 1982) cite no evidence of wrongdoing. They concentrate primarily upon establishing

tigation's failure to produce results.[7] Moreover, their canvass of the Michigan Bar had revealed that no competent attorney was available to represent them at an affordable fee, and they themselves were of the professional opinion that it would be difficult successfully to litigate against the Company in its home state. And, finally, their clients, unwilling to provide further financing for the litigation or to make the necessary trips to Michigan in order to pursue it, had given them peremptory instructions to drop it.[8]

The Company, on the other hand, was convinced that the law suit was wholly without merit and that its continuation by the defendant lawyers would prove futile. It was nonetheless apprehensive that its mere existence would produce unfavorable publicity hurtful to the Company, would divert the energies of important officials from the pursuit of the Company's business, and would involve undeterminable—if not uncontrollable—expenditures in legal fees and other disbursements.[9]

---

the defendant lawyers' good faith in *bringing* and *settling* the litigation.

2) One of the instant plaintiff's Interrogatories demanded that defendant lawyers:

State whether there was any "wrongdoing" by any defendant in the *Bader* action ... and if so, describe it in detail, including each specific act of wrongdoing and the individual[s] responsible for it.

The Cohn firm's rambling answer to this, after mentioning repayments by Mr. Ford and others, concluded with the following disclaimer:

"However, the fact of the repayments do (sic) not imply that there were any deliberate acts of wrongdoing."

3) As part of the Joint Statement (*infra* at 622), the defendant lawyers allowed themselves to be quoted as follows:

Mr. Cohn and Mr. Pollack said it now appears that there *was no wrongdoing* by Henry Ford II or the others who were involved in the suit, although a reading of the complaint demonstrates plaintiffs' disagreement with various company policies. (Italics supplied.)

Although this statement, because it was part of a settlement (*see* the Court's comments at oral argument on September 24, 1982 at 9–10; Federal Rule of Evidence 408; Advisory Committee Note to Rule 408 (1972) 56 F.R.D. 183, 227), might not be admissible at trial, it is difficult, as a practical matter, not to conclude that it represented the defendant lawyers' true opinion. In negotiating the settlement they were not acting solely for their nominal clients, but "as representative[s] of a class comprising all" Company stockholders. *See Cohen v. Beneficial Indus. Loan Corp.* (1949) 337 U.S. 541, 549, 69 S.Ct. 1221, 1227, 93 L.Ed. 1528. An obvious effect of the quoted statement was to discourage other stockholders from instituting similar litigation. If one were to assume the statement were not true, one would have further to assume that the defendant lawyers—in consideration of cash payment—intended to deceive their own clients. We decline to indulge the assumption that any of them could be guilty of such duplicity. We reject as frivolous the suggestion that the quoted statement could be interpreted as having meaning precisely opposite to the words used, *i.e.,*

that the words "there was no wrongdoing," should be deemed to have meant that there was a great deal of wrongdoing which had been corrected. *See* Cohn Affidavit dated August 30, 1982, ¶ 15.

We also note that, apparently in response to the allegations of the *Bader* litigation, the Securities and Exchange Commission in the summer of 1978 launched a formal, full-scale investigation. This was terminated without action in March, 1982. It could be argued that if the S.E.C.—with all its resources and expertise—could find no evidence of wrongdoing, it should be assumed that there was none. Whatever the merit of this argument, we do not deem it necessary to our decision.

7. By the time the settlement was arrived at, the investigation had published no indication of success. About a month thereafter, the Department of Justice formally notified the Company that it had terminated its probe, and had decided not to institute any proceedings.

8. Pollack Affidavit dated August 31, 1982, ¶ 6; Affidavit of I. Walton Bader dated August 30, 1982, ¶¶ 9, 10.

9. The Company's position in this respect is set forth in the following portion of a letter dated October 9, 1980, from Arjay Miller, then Chairman of its Audit Committee, to the instant plaintiff:

(1) It was clear that there was no possibility that a renewed action would confer any benefit on the Company. Messrs. Cohn and Pollack conceded that there had been "no wrongdoing." Moreover, the Audit Committee was continuing its investigation and was confident its own investigation would identify, if the investigations of the Justice Department or the Securities and Exchange Commission did not, any claims the Company should have pursued;

(2) The settlement eliminated a highly visible source of persistent negative publicity relating to the Company;

## TERMS OF THE SETTLEMENT

A settlement between the defendant lawyers, all but one of the *Bader* plaintiffs, and the Company was consummated in January of 1980. It was a primary condition of that settlement that the defendant lawyers, join in a Stipulation and Agreement (the "Stipulation") and a Joint Statement for Public Release (the "Joint Statement"). The Stipulation provided that neither plaintiffs nor their counsel, nor any member of counsels' firms would "recommence the Derivative Action or commence or participate in, as party or counsel, any derivative action in which there is asserted any claim which is the same as, similar to, or based upon the facts or subject matter of, any claim asserted in the Derivative Action." In addition, it required "Plaintiffs and Plaintiffs' Counsel [to] provide to Ford's Audit Committee any information in their possession that they would believe would support any of the charges made in the Derivative Action, except information which in their sole opinion is privileged or is a disclosure of the identity of a source." [10] Finally, it provided that the Company would pay each law firm "an attorneys' fee in the amount of $100,000 and disbursements of the two law firms up to a total of $30,000." Although nowhere explicitly stated in the terms of settlement, the Company asserts that the compromise was without prejudice to the rights of other shareholders to assert the allegations of the *Bader* complaint, as to which the Company and its directors had waived jurisdictional and time limitation defenses should such action be filed in Michigan.

The Joint Statement, dated January 11, 1980, reported the discontinuance of the *Bader* action, and stated that the "Company and the defendants named in that suit have denied and continue to deny" the charges contained therein. It further asserted that "Mr. Cohn and Mr. Pollack said it now appears that there was no wrongdoing by Henry Ford II or the others who were involved in the suit, although a reading of the complaint demonstrates plaintiffs' disagreement with various Company policies." The opinion of the Company's legal counsel was also included, which was to the effect that "the agreement was in the best interests of the Company and its shareholders and would avoid the legal expense and management distraction that would result from further litigation with plaintiffs, which would not confer any benefit on the Company."

The settlement was approved by unanimous vote of the Board of Directors (thirteen of whom were named in the *Bader* complaint), with the exception of Mr. Ford who did not participate. The Company paid each law firm the sum of $115,000.00.

## THE INSTANT LAWSUIT

The instant law suit was initiated on October 29, 1981. One of the theories upon which it is predicated is that the *Bader* settlement and the consequent payments to the defendant lawyers were specifically prohibited by New York's Business Corporation Law, § 626(d) of which provides that a derivative action "shall not be discontinued, compromised or settled, without approval of the court having jurisdiction of the action ...", and § 626(e) of which provides for court approval of awards of attorneys fees in derivative actions.

On April 27, 1982, the instant plaintiff moved for summary judgment on the ground, among others, that the aforementioned sections of the New York Business Corporation Law were dispositive. The Company, joined by the defendant lawyers, cross-moved for summary judgment, taking the position that the facts conclusively

(3) There was some chance the settlement might end pursuit of the charges entirely; (4) Settlement would avoid management disruption at a time when the Company was in the process of implementing a complete restructuring of its business and product lines; and

(5) The cost of the settlement was relatively modest, clearly less than the cost to the Company of litigating any renewed action initiated by Messrs. Cohn and Pollack or their law firms on the merits through trial.

10. The defendant lawyers turned nothing over to the Company pursuant to this provision.

established that the decision of the Company's Board of Directors to settle the law suit was an appropriate exercise of its business judgment. We denied both motions. With respect to the plaintiff's motion, we ruled that since the Appellate Division had dismissed the *Bader* action there was, at the time of the settlement, no suit pending in the New York courts, that there therefore existed no "court having jurisdiction of the action" and, accordingly, that the cited sections of the New York Business Corporation Law were inapplicable. With respect to the cross-motions we ruled that it was a question of fact whether or not the settlement was justified by the exercise of the Directors' business judgment.

There followed more than a year of discovery, at the conclusion of which all parties renewed their motions for summary judgment. On this occasion all parties stipulated that the Court could treat the totality of their affidavits as a complete record from which any appropriate inferences might be drawn, and that the Court might render such judgment as justice required.[11] The Company and the defendant lawyers now urge that discovery established the propriety of the Company's action in settling the case and that the lawyer defendants had—by inducing the special committee to take its above-described actions—conferred benefits on the Company for which they were properly compensated. The instant plaintiff, on the other hand, asserts that the Company's conduct was improvident; and that little, if any, cognizable benefit to the Company has been established. It is in that posture that the case is now before us.

## DISCUSSION

### I

■ We may say at the outset that if we should adhere to our ruling that the cited sections of the New York Business Corporation Law are inapplicable, and should further rule that the Board of Directors was entitled to exercise its business judgment in settling this stockholders' action just as it might in settling a law suit brought by a stranger, the instant plaintiff could not prevail and judgment for the defendants would be appropriate. Discovery having been completed and the parties having authorized us to draw factual inferences, we find that the Directors, acting upon information then available, were justified in thinking they were paying a reasonably modest price for ridding the Company of a potentially expensive headache.[12] We have concluded, however, that we erred in our ruling that the cited sections of the Business Corporation Law were inapplicable, and now hold that they specifically rendered unlawful both the settlement with the defendant lawyers and the payment of the monies in question.

Two subdivisions of the cited section (§ 626) are here relevant:

(d) [a derivative] action shall not be discontinued, compromised or settled, *without the approval of the court having jurisdiction of the action.* If the court shall determine that the interests of the

---

11. See Transcript of Oral Argument of October 5, 1984, at 2–3. To guard against the possibility that any party's discovery might have been curtailed because of mistaken reliance on the denial of plaintiff's motion for summary judgment, the Court announced by letter dated October 9, 1984, that it would entertain motions to re-open the record. The defendant lawyers did make such a motion, but it was denied. The decision not earlier to proffer the evidence presented by that motion could not have resulted from reliance upon the denial of summary judgment and the movants did not suggest any other reason why the proferred evidence could not have been submitted before discovery had been formally closed.

12. It is, of course, now easy to see that the $230,000 payment was unnecessary, because defendant lawyers were in no position to continue the litigation. However, corporate decisions are judged by information available at the time, and not by 20–20 hindsight. The Company, without the benefit of information developed by the instant litigation, had no way of knowing that the defendant lawyers had become disenchanted with their lawsuit, had been unable to find affordable Michigan counsel willing to pursue it, and had been instructed by their clients to abandon it.

shareholders or any class or classes thereof will be substantially affected by such discontinuance, compromise, or settlement, the court, in its discretion, may direct that notice, by publication or otherwise, shall be given to the shareholders or class or classes thereof whose interests it determines will be so affected; * *

(e) If the action on behalf of the corporation was successful, in whole or in part, or if anything was received by the plaintiff or plaintiffs or a claimant or claimants as the result of a judgment, compromise or settlement of an action or claim, the court may award the plaintiff or plaintiffs, claimant or claimants, reasonable expenses, including reasonable attorney's fees, and shall direct him or them to account to the corporation for the remainder of the proceeds so received by him or them. * * * (Italics supplied.) [13]

In ruling that the foregoing provisions were inapplicable because there was "no action pending," we misread the statutory language. The relevant provision of subdivision (d) (italicized in the quotation) says nothing about the "pendency" of an action, but prohibits payment "without the approval of the court *having jurisdiction* of the action." As all parties now concede,[14] the New York Supreme Court—either through its Special Term or its Appellate Division—never lost its jurisdiction. It was always

open to the defendant lawyers to make application at the foot of the judgment for precisely the relief they now seek. Accordingly, there existed a "court having jurisdiction of the action" and it was unlawful for the parties to compromise their dispute without its approval.

The authorities and arguments advanced by the defendants are either irrelevant or unpersuasive. One of the cases principally relied upon is *Wolf v. Barkes* (2d Cir.) 348 F.2d 994, *cert. denied* (1965) 382 U.S. 941, 86 S.Ct. 395, 15 L.Ed.2d 351. There, the Court, speaking through then Chief Judge Friendly, rejected a contention—which it found "interesting and by no means without force" (*id.* at 994–995)—that Rule 23.1 of the Federal Rules of Civil Procedure could be invoked not only to require court approval for the settlement of a derivative action but to require such approval before the corporation could settle a third party dispute which happened to be one of the subjects of the derivative action. Judge Friendly pointed to three obstacles to this contention:

1. It was doubtful whether the accomplishment of such a substantive result came within judicial authority to adopt procedural rules (*id.* at 996, 997);

2. The conduct complained of did not violate the express language of the rule (*id.* at 996); and

---

**13.** The rules existing in Delaware, where the Company is incorporated, and in Michigan, the potential new site of the lawsuit, are substantially to the same effect. Rule 23.1 of the Delaware Chancery Court Rules provides:

[A derivative action] shall not be dismissed or compromised without the approval of the Court, and notice by mail, publication or otherwise of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the Court directs; *except that if the dismissal is to be without prejudice or with prejudice to the plaintiff only, then such dismissal shall be ordered without notice thereof if there is a showing that no compensation in any form has passed directly or indirectly from any of the defendants to the plaintiff or plaintiff's attorney and that no promise to give any such compensation has been made.* (Italics supplied.)

Sections 450.1492 and 450.1493 of 24A Michigan Corp.Laws Ann. (1979) provide:

*§ 450.1492*
[A derivative] action authorized by section 491 shall not be discontinued, compromised or settled without approval by the court having jurisdiction of the action.

*§ 450.1493*
(1) If an action brought in the right of the corporation is successful, in whole or in part, or if anything is received by the plaintiff or a claimant as a result of a judgment, compromise or settlement of an action or claim, the court may award the plaintiff or claimant reasonable expenses, including reasonable attorney's fees, and shall direct him to account to the corporation for the remainder of the proceeds so received by him.

**14.** See Transcript of Oral Argument of January 25, 1985 at 13, 20, 24.

3. The proposed settlement did not constitute the evil the rule was intended to prevent (*id.* at 996).

None of these obstacles is here present.

1. We are dealing not with a judicial rule but with a state statute. Although §§ 626(d) and (e) are modelled on Fed.R. Civ.Proc. 23, they are part of the state statutory scheme which sets the terms on which the state authorizes litigation of a fiduciary nature. *See* Business Corporation Law §§ 626, 627, 722. There can be no question of the state's *power* to enact a statute prohibiting the instant settlement. As the Supreme Court, speaking through Justice Jackson in *Cohen v. Beneficial Indus. Loan Corp.* (1949) 337 U.S. 541, 550, 69 S.Ct. 1221, 1227, 93 L.Ed. 1528 observed: "the state has plenary power over this type of litigation."

2. There could be no clearer violation of the precise words of the statute than what was done in the *Bader* case.

3. The *Bader* settlement accomplished precisely the evil the statute was designed to prevent. As Judge Friendly noted in *Wolf* (*supra,* 348 F.2d at 996), "[t]he prime 'mischief and defect'" the requirement of court approval is intended to prevent is "'private settlements under which the plaintiff stockholder and his attorney got the sum paid in settlement, and the corporation got nothing.'"

Neither of the other cases cited by the defendants, *Blau v. Rayette-Faberge, Inc.* (2d Cir.1968) 389 F.2d 469, or *Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc.* (2d Cir.1972) 455 F.2d 770, supports their position. *Blau* dealt with an alleged violation of federal securities law, and the Court ruled that federal policy to employ private litigation to enforce those laws required judges to "'not be too niggardly'" in awarding fees in connection with such litigation. (389 F.2d at 472.) The case has nothing whatever to do with the interpretation of state statutes which—as Justice Jackson ob-

served in *Beneficial,* 337 U.S. at 548–550, 69 S.Ct. at 1226–1227—were enacted for precisely the opposite purpose. In *Weight Watchers,* a class action, the court, speaking through Judge Friendly, observed that F.R.Civ.P. 23 did not prohibit a defendant from settling with individual members of a class. Assuming that a similar rule should apply to derivative actions, that observation is inapplicable to the situation at bar. Here, the entire lawsuit pending against the directors was settled solely on the basis of the Company's payment of cash to the plaintiffs' attorneys. As we have observed, that is precisely the evil which the Business Corporation Law was designed to prevent.

Nor is there any merit in the Company's contention that the statute is inapplicable because the settlement was without prejudice to the rights of other stockholders and therefore there was no occasion to give them notice. A quick look at subdivision (d) of the statute (*see supra* at 623–624) discloses that it has two provisions here applicable. The first, italicized in the above quotation, absolutely prohibits settlements without court approval, and the second gives the court discretion to require notice to other stockholders. The "without prejudice" aspect of the settlement might well result in a court's decision not to require notice, but has nothing to do with the unqualified prohibition against unapproved settlements.[15]

Nor is it material that most or all the settlement activities may have taken place in Michigan. The parties were settling a lawsuit initiated in the New York Supreme Court, and all of the activity for which the defendant lawyers now claim compensation took place in connection with that lawsuit. To paraphrase Justice Jackson's observation in *Beneficial,* 337 U.S. at 554, 69 S.Ct. at 1229, the defendant lawyers cannot avail themselves of the New York forum and at the same time escape the terms on which it was made available.

---

**15.** We note that under Delaware procedures, the cash payment would have required notice regardless of the lack of prejudice to other share-holders. *See* italicized portion of Delaware Chancery Court Rule 23.1, *supra* at fn. 13.

The defendants place great reliance on this Circuit's decision in *Certain-Teed Products Corp. v. Topping* (2d Cir.1948) 171 F.2d 241. In that case the Court held that where an attorney had failed to comply with the requirements of F.R.Civ.P. 23, he would not forfeit all claim for legal fees but would be entitled to retain such fees as a subsequent court might find appropriate. We do not believe the Court of Appeals would apply that ruling to the instant situation.

Although there are distinct similarities between the facts there involved and the instant case, the decisive distinction is that *Certain-Teed* dealt with services claimed to have been performed in a federal lawsuit (District of Rhode Island) covered by the federal rules, while the instant action deals with such services in a state lawsuit governed by a state statute. As Judge Friendly observed in *Wolf*, the federal judiciary has only limited power in establishing procedural rules (349 F.2d at 996). A state legislature on the other hand "has plenary power over [derivative] litigation" (*Beneficial*, 357 U.S. at 550, 69 S.Ct. at 1227). We do not believe that the Court of Appeals would sanction circumvention of New York's explicit statutory command that a derivative action *"shall not be settled"* without approval of the court in which it was brought.

## II

■ However, in the interest of judicial economy, we shall proceed on the assumption that defendants may look to some other tribunal to establish their entitlement to fees.[16] In such other tribunal, the first problem that would confront the defendant lawyers arises from the stark fact that they have been unable to establish wrongdoing by any of the Company's directors. (*See supra* at 620 and fn. 6.) This presents the policy question of whether or not a stockholder should be entitled to have his attorney compensated for making helpful suggestions to a board of directors which has not been shown to have been guilty of any wrongdoing. The courts of Delaware—to which a New York court would look for guidance on this policy question (*cf. Galef v. Alexander* [2d Cir.1980] 615 F.2d 51, 58)—have emphatically answered that question in the negative.

In *Chrysler Corporation v. Dann* (1966) 43 Del.Ch. 252, 223 A.2d 384, the Delaware Supreme Court carefully considered this issue. After outlining policy considerations—including the importance of discouraging derivative law suits brought "for the purpose of obtaining counsel fees" (223 A.2d at 387)—the court established the rule that no such fees could be awarded without establishing that the action instituted by the plaintiff had been "meritorious." (*Ibid*). The term "meritorious" was defined as including the requirement that "the plaintiff possesses knowledge of *provable facts* which hold out some reasonable likelihood of ultimate success." (*Ibid*; italics supplied). The Court reconsidered the question and adhered to the above ruling in *McDonnell Douglas Corp. v. Palley* (1973) 310 A.2d 635, 637 and *Allied Artists Pictures Corporation v. Baron* (1980) 413 A.2d 876, 879. We therefore conclude that a New York court would disallow any claim

---

16. We note that we may have been in error in our suggestion at the October 5, 1984 oral argument that—regardless of the restrictions of §§ 626(d), (e) of the Business Corporation Law—a New York court would not have jurisdiction to entertain the defendant lawyers' claim unless it were in the form of an application for fees in an ongoing action. The only New York case cited by the parties on this issue (and our research has disclosed no other) is *Schreiber v. United Whelan Corp., N.Y.L.J.* Sept. 14, 1965, p. 16 col. 6(f) (Sup.Ct.N.Y.Cty.1965). The court there considered and specifically rejected our suggested position that any claim for fees must be confined to an ancillary application in the derivative action itself. However, in that case the court which had dismissed the derivative suit did so with the express provision that dismissal was without prejudice to a fee application in a plenary action. By thus providing for a plenary action, the court "having jurisdiction" gave its approval to the procedure adopted. *See also Levine v. Bradlee* (3d Cir. 1967) 378 F.2d 620 (plaintiff expressly reserved issue of attorney's fees upon dismissal of derivative action as moot).

by the defendant lawyers for lack of standing to assert it.[17]

## III

Assuming, *arguendo*, that the defendant lawyers do have standing to ask us to determine their just compensation, we proceed to an analysis of what fee would be appropriate.

Two considerations are relevant to such analysis:

1) What cognizable benefit have the defendant lawyers conferred upon the Company? (*City of Detroit v. Grinnell* (2d Cir.1974) 495 F.2d 448, 469, 470; *see Mills v. Electric Auto-Lite* (1970) 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593); and

2) What portion of their work can be deemed a competent producing cause of such benefit? (*Wechsler v. Southeastern Properties, Inc.* (2d Cir.1974) 506 F.2d 631, 635.)

With respect to the $34,595 the Company recovered from Mr. Ford, we find that the defendant lawyers' activities can be considered a competent producing cause. Mr. Ford, after all, was not only the Chairman of the Board but the grandson and namesake of the Company's founder and its leading personality. It is therefore arguable that but for the furor aroused by the *Bader* action, Company auditors might have been less attentive to small details in the justification of his personal expenses.

**17.** Moreover, even if Delaware law were not found to be controlling, a similar result would seem to follow were we to consider "'the strength of the case for plaintiffs balanced against the amount offered in settlement.'" *City of Detroit v. Grinnell Corp.* (2d Cir.1974) 495 F.2d 448, 455 (citation omitted). Since the defendant lawyers have not shown that their case had any strength at all, there is nothing to balance against the amount paid.

So far as counsels' research (and our own) has revealed, there has never—with one possible exception—been an instance in which a shareholder's attorney has been awarded fees in the absence of a showing of merit. The cases can conveniently be divided into two categories: those in which some determination of merit was made and those in which merit could be inferred from the defendants' rectification of the specific wrong alleged in the complaint. In the first category fall *Kopet v. Esquire Realty Co.* (2d Cir.1975) 523 F.2d 1005 (defendants admitted liability); *Lewis v. Anderson* (9th Cir.1982) 692 F.2d 1267 (complaint withstood motion for summary judgment, trial court found plaintiff likely to succeed on merits, and defendants did not dispute this finding on appeal); and *Abrams v. Textile Realty Corp.* (N.Y.Cty.1949) 97 N.Y.S.2d 492 (corporation enjoined from entering into *ultra vires* mortgage). The second category of cases include *Altman v. Central of Georgia Ry. Co.* (D.C.Cir.1978) 580 F.2d 659 (suit to compel payment of dividends caused company to declare same during pendency of suit); *Milstein v. Werner* (S.D.N.Y.1973) 58 F.R.D. 544 (action charging excessive and improper officer compensation caused company significantly to alter executive stock purchase plan); *Ripley v. International Railways of Central America* (1st Dep't) 16 A.D.2d 260, 227 N.Y.S.2d 64, *aff'd* (1962) 12 N.Y.2d 814, 236 N.Y.S.2d 64, 187 N.E.2d 131 (suit challenging transportation rates caused company to revamp same); *Martin*

*Foundation v. Phillip-Jones Corp.* (Kings Cty. 1953) 204 Misc. 120, 123 N.Y.S.2d 222, *modified* (2d Dep't) 283 A.D. 729, 127 N.Y.S.2d 649, *aff'd* 306 N.Y. 972, 120 N.E.2d 230 (suit charging illegality of proposed contracts caused corporation to cancel same); *Chrysler Corp. v. Dann, supra* (action challenged wasteful compensation plan which was overhauled by corporation pursuant to settlement); *McDonnell Douglas Corp. v. Palley, supra* (attempt to rescind certain preferred stock succeeded when corporation merged with parent); and *Allied Artists Pictures Corp. v. Baron, supra* (suit charged improper election of directors who were removed when corporation merged with another), as well as those in which the attorney fee applicant had brought to the corporation's attention claims of short-swing profits by a particular officer, which improper gains the corporation then recovered without litigation. *Blau v. Rayette-Faberge, supra; Gilson v. Chock Full O'Nuts* (2d Cir.1964) 331 F.2d 107; *Smolowe v. Delendo* (2d Cir.1943) 136 F.2d 231, *cert. denied,* 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446; *Dottenheim v. Emerson Electronic Mfg. Co.* (E.D.N.Y.1947) 7 F.R.D. 195. In the instant case, there was of course no judicial finding of merit. As to possible rectification of wrongdoing, the only identifiable benefit resulting from multi-million dollar charges of fraud and chicanery was the repayment by Mr. Ford of $34,585. This repayment—as the defendant lawyers have specifically conceded (*supra* at fn. 6)—is not evidence of wrongdoing. The possible exception to which we have referred is *United Operating Company v. Karnes* (S.D.N.Y.1980) 482 F.Supp. 1029, which seems to sanction settling a frivolous derivative action by payment to plaintiff's attorneys. Although the pragmatic argument advanced in *Karnes* is appealing, we believe the rule promulgated by the Supreme Court of Delaware to constitute a more salutary doctrine of corporate governance.

The same, however, cannot be said for the $11,215.40 received from unidentified officers and employees. There is nothing in the record to suggest that those irregularities would not have been uncovered by audits routinely made by the Company's accountants.

As for the new guidelines and the "heightened sensitivity" the investigation is said to have produced, we conclude that they, too, could be said to have resulted from the defendant lawyers' activities. However, there is, as above noted (*supra* at 619–620 and fn. 5), not a scintilla of evidence there was tangible benefit to the Company. We do not believe that equity should authorize compensating a stockholder or his attorney for bringing about such purely "cosmetic" and ephemeral changes. Our conclusion in this regard is fortified by contrasting these changes with the type of tangible non-monetary benefits for which stockholders' attorneys have previously been compensated. *Compare Mills v. Electric Auto-Lite* (1970) 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (invalidating merger which had been accomplished through use of misleading proxies); *Sprague v. Ticonic Bank* (1939) 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (establishing a lien on bank funds which, through principle of *stare decisis*, created like rights for other depositors not parties to the suit); *Koppel v. Wien* (2d Cir.1984) 743 F.2d 129 (causing withdrawal of proposed amendment to a participation agreement which would have reduced value of participation rights); *Kopet v. Esquire Realty Co.* (2d Cir. 1975) 523 F.2d 1005 (identifying securities law violation, giving limited partners right to rescind purchases, uncovering certified financial statements which might facilitate partnership's further recovery); *Lewis v. Anderson* (9th Cir.1982) 692 F.2d 1267 (causing stock option plan to be submitted to shareholders for approval); *Altman v. Central of Georgia Ry. Co.* (D.C.Cir.1978) 580 F.2d 659 (causing the corporation to declare dividends); *Milstein v.*

*Werner* (S.D.N.Y.1973) 58 F.R.D. 544 (causing alteration of stock purchase plan, which would probably result in substantial financial savings to the corporation); *Whittemore v. Sun Oil Co.* (S.D.N.Y.1973) 58 F.R.D. 624 (making it possible for stockholders to receive dividends and to exercise conversion rights); *Globus, Inc. v. Jaroff* (S.D.N.Y.1968) 279 F.Supp. 807, 809 (cancellation of option agreement relieved corporation of obligation to issue stock at below-market price and was "an actual, practical benefit in the business sense").

■ With respect to correlating the defendant lawyers' efforts with achievement of the identified $34,585 benefit, we find this an impossible task on the record before us. It is plain, however, that most of the defendant lawyers' work could not be so correlated. The Company, for example, could not have benefitted by the defendant lawyers' activities seeking to compel it to litigate in an inappropriate forum. Nor is it discernable how the Company could have benefitted by litigation designed to establish that one law firm—rather than two—was entitled to participate in a suit against its directors. So far as we can see, the only part of the defendant lawyers' time that could have benefitted the Company was that spent interviewing the informant and drafting the several complaints and answers to interrogatories which are claimed to have alerted the Company to Mr. Ford's unauthorized expenditures at the Carlyle Hotel. However, if the case were remanded to us we would not—unless otherwise directed—pursue the question of proper allocation of the defendant lawyers' time. The amount of money involved would not justify the expense of such an inquiry. We would arbitrarily allow the defendant lawyers to retain one-third of the payments received from Mr. Ford, or $11,528.33, plus any disbursements they could relate to the activities we have found to be relevant.[18]

---

**18.** Such a procedure would obviously fail to adhere to the guidelines laid down in *Grinnell v. City of Detroit* (2d Cir.1974) 495 F.2d 448, and its progeny. But we believe the procedure to be dictated by common sense. If our analysis is otherwise correct, we would not in our discretion allow a fee in excess of one-third of the Company's recovery. No paring down of that

## CONCLUSION

In summary, plaintiff's motion for summary judgment is granted. Let the Clerk enter judgment against the defendant lawyers jointly and severally in the sum of $230,000 with pre-judgment interest from January 11, 1980. Such judgment will specify that an application to this Court for attorneys fees and expenses may be made by the instant plaintiff and his counsel within 30 days after any appeal from this Order shall have been finally adjudicated, or within 30 days after the time for appeal shall have lapsed without an appeal having been perfected.

SO ORDERED.

amount (even if wholly to eliminate it) could compensate the Company for the time and aggravation involved in its achievement. In light of this disposition, we need not inquire whether or to what extent the Cohn firm may be excused for its failure to follow the contemporaneous time record rules suggested in *In Re Hudson & Manhattan R.R. Co.* (2d Cir.1964) 339 F.2d 114, 115. The firm would not, of course, have been bound by the prospective mandatory rule announced in *New York Ass'n for Retarded Children v. Carey* (2d Cir.1983) 711 F.2d 1136, 1147.